109 P.3d 27 (2005)
STATE of Washington, Respondent,
v.
Piarre Dinard PRICE, Appellant.
No. 29255-6-II.
Court of Appeals of Washington, Division 2.
February 23, 2005.
Publication Ordered March 30, 2005.
*31 John Michael Sheeran, Attorney at Law, Pierce City Prosecutor S, Tacoma, WA, for Respondent.
Pattie Mhoon, Attorney at Law, Tacoma, WA, for Appellant.
BRIDGEWATER, J.
¶ 1 Piarre Dinard Price appeals his conviction of aggravated first degree murder. We hold that the trial court did not deny Price's Sixth Amendment right to counsel by denying his request to retain new counsel because he made the request 10 months after having been appointed counsel, the jury had been sworn, and he had neither the resources nor an attorney ready to undertake his defense. As well, we hold that the trial court correctly admitted Price's Alford plea to domestic violence as an admission under ER 801(d)(2) and properly limited its use to the jury's consideration of whether the State had proven the aggravating circumstances beyond a reasonable doubt. We also hold that the trial court should have given a unanimity instruction regarding the alleged acts constituting aggravating factors concerning the "three or more assaults" relied upon, where the State presented evidence of five assaults within a five year period. But we conclude that the failure to give the unanimity instruction was harmless because no rational trier of fact could have entertained a reasonable doubt that each incident established an assault beyond a reasonable doubt. There was sufficient evidence to support Price's conviction. We affirm.
¶ 2 Piarre Price dated Stephanie Sheaffer for approximately six years between 1996 and 2002, and the couple had a four-year-old daughter. Ms. Sheaffer also had two other children.
¶ 3 In August 1998, Detective Mark Collier of the Pierce County Sheriff's responded to a report of domestic violence at Ms. Sheaffer's apartment. When Deputy Collier investigated, *32 he noted that Ms. Sheaffer had red marks on her neck and a swollen lip, and she appeared upset and afraid. Price was charged with fourth degree assault, attempted unlawful imprisonment, and harassment. All three counts were designated as domestic violence offenses. Price entered an Alford[1] guilty plea to the charges.
¶ 4 In December 1999, Ms. Sheaffer was driving to her children's daycare when Price unexpectedly appeared and forced her vehicle onto the shoulder of the road. Ms. Sheaffer's friend, Jacqueline Legett, was riding in the car with her. Price approached them in the oncoming lane, and Ms. Sheaffer had to swerve off the road to avoid a collision with him. Price then drove into the daycare parking lot. As Ms. Sheaffer and Legett went into the daycare, Legett saw Price "mouthing" words to Ms. Sheaffer. 6 Report of Proceedings (RP) (Jul. 10, 2002) at 445.
¶ 5 A few weeks later, Ms. Sheaffer's step-sister, Misty Grzelka, and Legett were visiting Ms. Sheaffer at her apartment. They decided to go to Grzelka's apartment after Price made repeated phone calls to Ms. Sheaffer. All three drove separately to Grzelka's home. Price appeared and again began driving in the oncoming lane of traffic toward Ms. Sheaffer, forcing her to drive off the road.
¶ 6 In March 2000, Ms. Sheaffer drove Grzelka to her house after they had been shopping. As Ms. Sheaffer approached Grzelka's home, Price drove up and jumped out of his vehicle. Price pushed Ms. Sheaffer up against her car. Ms. Sheaffer tried to push Price away, and he grabbed her around the neck and put her in a headlock.
¶ 7 In late July 2001, Ms. Sheaffer's sister, Becky Sheaffer, was living with her. Becky heard Ms. Sheaffer tell Price that she did not want to be with him anymore because she was not happy and no longer loved him. Ms. Sheaffer also told Price to move his belongings out of her apartment. Price responded that he did not want to move out, and the couple continued arguing. The following morning, Becky saw her sister sitting next to Price on the couch, crying. When Becky asked her sister to come upstairs to talk, Ms. Sheaffer "started crying even more." 5 RP (Jul. 9, 2002) at 363. A few days later, Price moved out of Ms. Sheaffer's apartment.
¶ 8 At trial, Becky testified that Price called Ms. Sheaffer's apartment 20-30 times a day after he moved out. When Becky spoke with Price, he was frantic and angry and repeatedly asked about seeing his daughter. Becky further testified that during this time period, Price choked her sister. Becky saw a broken blood vessel in Ms. Sheaffer's eye and bruises on her neck. During one of Price's phone calls, Becky asked him why he had choked Ms. Sheaffer, and Price told her that "he knew he shouldn't have choked her" but that he did not want to talk about it. 5 RP at 367. Becky told Price to "leave [them] alone," and he reacted angrily. 5 RP at 368.
¶ 9 During this period, Ms. Sheaffer was working at Good Samaritan Hospital in Puyallup, Washington. On August 25, Ms. Sheaffer spoke with a co-worker, Dr. Wayne Duran. Ms. Sheaffer asked Dr. Duran to examine her, and Dr. Duran observed that Ms. Sheaffer had redness over the white of her eye, a condition known as subconjunctival hemorrhage. Ms. Sheaffer also had bruise marks on her neck in the shape of fingers and pinpoint hemorrhages in the area around her right eye. At trial, Dr. Duran testified that Ms. Sheaffer's injuries were consistent with the injuries produced by strangulation.
¶ 10 Dr. Duran conducted a physical examination of Ms. Sheaffer. Ms. Sheaffer told him that on the morning of August 23, Price grabbed her by the throat and choked her until she passed out. When she awakened, she had a fullness sensation in her right throat area and experienced difficulty swallowing. Ms. Sheaffer also told Dr. Duran that Price had threatened to kill her.
¶ 11 Two weeks later, on September 10, 2001, at 9:00 A.M., as Ms. Sheaffer was going to pick up her daughter for a doctor's appointment, Price murdered her on the front steps of her grandparents' home. Ms. Sheaffer *33 was 26 years old. Ms. Sheaffer's grandparents, Doris and Phillip Alexander, heard gunshots and someone outside their front door. 4 RP (Jul. 8, 2002) at 119. They found Ms. Sheaffer dead, lying face down in a pool of blood on their front porch. Mrs. Alexander saw a dark-colored car drive away. At that time, Price was driving a black Volkswagen Jetta.
¶ 12 Several witnesses were present when Ms. Sheaffer was murdered. Kathy Perdue was driving by the Alexanders' home when she heard "popping noises" that appeared to be either gunshots or firecrackers. 4 RP at 224. She saw a black man of average height, wearing a blue shirt and black pants, standing near a house. She then saw a black Jetta parked next to the road "take off," as if the driver was in a hurry. 4 RP at 225-26.
¶ 13 Stanley and Betty Gibbs were also driving by the Alexanders' home at the time of the murder. The couple heard three or four gunshots, and Mr. Gibbs saw a black man running from a house to a car. Mr. Gibbs testified that the man appeared to be in his 30s and was wearing a blue shirt. Mr. Gibbs noticed that the man had something in his hands. Mrs. Gibbs testified that she observed a dark man with short hair running from a house. The man was "[p]robably in his 30s" and was wearing a blue jacket. 5 RP at 252. The man ran to a small, black car and had a gun in his hand. The Gibbs attempted to write down the man's license plate number, but they were unable to do so. Mrs. Gibbs noticed that the car did not have a front license plate. Price's Jetta did not have a front license plate.
¶ 14 Ted Schlosser, a forensic investigator with the Pierce County Sheriff's Department collected four .380 shell casings from the scene, and another shell was found a few days later. An autopsy revealed that Ms. Sheaffer had been shot five times and had died from gunshot wounds. The bullets collected from Ms. Sheaffer's body were compared with those recovered from the scene of the murder, and four of the five bullets were found to have come from a .380 caliber pistol. The fifth shell was too mutilated to make a comparison.
¶ 15 Prior to Ms. Sheaffer's murder, Price worked at Golden State Foods in Sumner, Washington. At trial, Dashondi Johnson, one of Price's co-workers, testified that Price kept his hair in braids, close to his head, and drove a black Jetta. Johnson's wife, Danielle Johnson, testified that Price drove a black Jetta and had short hair.
¶ 16 In January or February 2001, Price asked Johnson to store a gun for him. Johnson agreed and placed the gun in his attic. Approximately a month before the shooting, Price went to Johnson's home to pick up his gun. Lael Nelson, who had retrieved the gun from the attic for Price, testified that he believed the gun was a .380 caliber pistol because there was a .380 caliber ammunition box with the gun.
¶ 17 Shortly after the murder, Brandi Brown called the police to report that Price's black Jetta might be in California. At trial, Brown testified that, after hearing about the murder, she contacted Price on his cell phone. The two met at a Texaco station in Portland, Oregon. Brown testified that although Price normally kept his hair in braids, his head was shaved when she met him in Portland. She also noticed that Price's Jetta now had California license plates. Brown spoke with Price at a hotel in Portland and agreed to meet him the next day. During cross-examination, defense counsel asked Brown why she had agreed to meet Price again, and the prosecutor objected. The court sustained the objection.
¶ 18 On September 15, 2001, Price was arrested while driving his Jetta in Chehalis, Washington. The Jetta had California license plates. Police found grooming products, medications, and several hair trimmers inside the vehicle. They also found Price's Washington State license plates.
¶ 19 The State charged Price by information with aggravated first degree murder. The alleged aggravating circumstances were: (1) at the time of the murder, the defendant and the victim were "family or household members"; and (2) the defendant had previously engaged in the practice of three or more assaults or incidents of harassment against the victim within a five-year period. Clerk's Papers (CP) at 1. The information *34 also charged a 60-month firearm sentencing enhancement. Two lawyers were appointed to represent Price.
¶ 20 Trial began on July 1, 2002, and 60 prospective jurors were sworn. The following morning, Price informed the court that he wanted to hire different counsel. Price stated that he had a "conflict of interest" with his attorneys and that they were not "representing [him] as [he] want[ed] to be represented." 2 RP (Jul. 2, 2002) at 23. Price did not "feel able to communicate" with his attorneys, and he did not believe that they were effectively representing him because they had not come to see him enough times in jail, they had not yet interviewed Dr. Duran, and they had been unable to suppress his prior domestic violence incidents based on the fact that he had not been arrested for any probation violations. 2 RP at 25. Price's counsel informed the court that they had seen him in jail 7 to 10 times.
¶ 21 The court asked Price if he had taken any steps to hire an attorney, and Price responded that he had been "looking around" but that he had not really tried to hire an attorney because "of some of the stuff that's been going on that would  with these two attorneys." 2 RP at 26. The court then asked Price if he had the financial ability to hire private counsel and Price responded that his mother was going to help him, but that she was not in court that day.
¶ 22 The court denied Price's request, finding the following:
There's nothing here before the Court on the second day of trial other than your statement that your mother is going to help you out with a lawyer. You don't have a lawyer coming in here. You don't have your mother here with the money. There's nothing that shows here we have another lawyer to step into the shoes of Mr. Clark and Mr. Olbertz to take over the case. So that would result in a substantial delay which would prejudice the parties in this case which is another situation that the Court is to consider.
2 RP at 28. The court also found that Price's attorneys were competent to represent him.
¶ 23 In addition, Price moved to preclude the State from introducing the August 1998 complaint charging him with assault, harassment, and attempted unlawful imprisonment of Ms. Sheaffer; his Alford plea; and the statement of probable cause. Price argued that his Alford plea was hearsay and was not a statement or admission by Price under ER 801(d)(1) and (2), respectively. The court admitted all but the statement of probable cause, holding that an Alford plea is admissible as an admission under ER 801(d)(2).
¶ 24 During trial, deposition testimony by Price's wife, Bernice Price, was read to the jury.[2] She met Price in 1989, and they lived together until 2000, when they began considering divorce. She also had learned that Price was dating Ms. Sheaffer and that they had a child together. Mrs. Price further testified that on September 9, 2001, the day before Ms. Sheaffer's murder, Price went to work at 5:00 P.M. in the Jetta and returned to stay overnight in her living room. The next morning, around 8:15 A.M., Mrs. Price drove the Jetta to go shopping at a fruit stand and the Lakewood Marketplace. She was gone for approximately 40-60 minutes. Price remained at Mrs. Price's apartment to check some problems with her vehicle. After Mrs. Price returned home, Price took her car for a test drive and returned before 10:00 A.M. While Price was gone, his Jetta remained parked at her apartment. Mrs. Price further testified that Price's head was shaved when he came to her apartment on September 9, and that he was wearing a gray shirt and sweat pants the following day.
¶ 25 The jury found Price guilty as charged. Additionally, the jury found by special verdicts that aggravating circumstances  a pattern or practice of domestic violence incidents against Ms. Sheaffer  existed and that Price was armed with a firearm at the time of the crime.

I. Right to Counsel
¶ 26 Price first contends that the trial court violated his Sixth Amendment right to *35 counsel. Specifically, Price argues that the court denied him the right to representation by counsel of "[his] choice." Br. of Appellant at 19. The State responds that the court did not abuse its discretion because Price's trial had already begun and he had not yet hired new defense counsel to represent him. The State is correct.
¶ 27 The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. CONST. amend. VI. Among the components of the constitutional right to counsel is "the right to a reasonable opportunity to select and be represented by chosen counsel." State v. Roth, 75 Wash.App. 808, 824, 881 P.2d 268 (1994), review denied, 126 Wash.2d 1016, 894 P.2d 565 (1995) (citing Gandy v. Ala., 569 F.2d 1318, 1323 (5th Cir.1978)). But the essential aim of the Sixth Amendment is to guarantee an effective advocate for each criminal defendant, not to ensure that a defendant will inexorably be represented by his or her counsel of choice. Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The right to retained counsel of choice is a not a right of the same force as other aspects of the right to counsel; a criminal defendant does not have an absolute, Sixth Amendment right to choose any particular advocate. Roth, 75 Wash.App. at 824, 881 P.2d 268. In particular, a defendant may not insist upon representation by an attorney he cannot afford. State v. Roberts, 142 Wash.2d 471, 516, 14 P.3d 713 (2000).
¶ 28 We grant broad discretion to trial courts on motions for continuances sought to preserve the right to counsel; only an "`unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay'" violates the defendant's right. Roth, 75 Wash.App. at 824, 881 P.2d 268 (quoting Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983)). In general, trial courts must balance the defendant's right to counsel of his or her choice against the public's interest in prompt and efficient administration of justice. Roth, 75 Wash.App. at 824, 881 P.2d 268. In determining whether the trial court has abused its discretion, we consider the following factors: (1) whether the court had granted previous continuances at the defendant's request; (2) whether the defendant had some legitimate cause for dissatisfaction with counsel, even though it fell short of likely incompetent representation; (3) whether available counsel is prepared to go to trial; and (4) whether the denial of the motion is likely to result in identifiable prejudice to the defendant's case of a material or substantial nature. Roth, 75 Wash.App. at 825, 881 P.2d 268.
¶ 29 Price argues that the court erroneously considered whether his defense attorneys were qualified and competent to represent him in denying his request to hire a new attorney because Roth does not require that a defendant demonstrate that his or her current counsel is ineffective. But regardless of whether the court improperly considered the test for ineffective assistance of counsel in evaluating Price's request, it did not abuse its discretion.
¶ 30 First, Price failed to show that he could afford to hire a new attorney. See Roberts, 142 Wash.2d at 516, 14 P.3d 713. The court had appointed counsel originally because he was indigent. Although Price informed the court that his mom was "going to help [him] out," his mother was not in attendance at trial, and he offered no other evidence to support this claim. 2 RP at 26. In addition, the prosecutor argued that, based on his knowledge of the case, Price did not have the financial means to hire an attorney.
¶ 31 Second, Price did not have other competent counsel prepared to go to trial. When questioned as to whether he had taken any steps to retain a new attorney, Price informed the court that he "ha[dn't] really tried to get a lawyer up to now because of some of the stuff that's been going on that would  with these two attorneys." 2 RP at 26. Thus, Price was essentially requesting that the court grant him a continuance to procure new counsel. Price argues that the court's determination that substantial delay would occur if Price was permitted to hire new counsel was unsupported by the record *36 and was "based on no more than speculation." Br. of Appellant at 22. Price is in error.
¶ 32 Price made his request to hire a new attorney on the second day of trial almost 10 months after his arraignment; day-of-trial continuances are not favored. See State v. Chase, 59 Wash.App. 501, 506, 799 P.2d 272 (1990) (holding that a request for a continuance to obtain new counsel made on the day of trial was untimely). The court had already sworn in a prospective jury and the witnesses and attorneys were prepared for trial. Not only had Price failed to procure the funds necessary to hire an attorney, he had not hired or even contacted a new attorney. In addition, because Price's charges were extremely serious  first degree murder with aggravating circumstances  a new attorney would require a substantial amount of time to competently prepare for trial. Thus, the court reasonably concluded that permitting Price to obtain new counsel would entail substantial delay and prejudice to the other parties involved.
¶ 33 Third, Price failed to articulate a legitimate cause for hiring a new attorney. Price's counsel informed the court that Price wanted to hire a new attorney because he did not "feel able to communicate" with his attorneys, and he did not believe that they were effectively representing him. 2 RP at 25. They had not come to see him enough times in jail, they had not yet interviewed Dr. Duran, and they had been unable to suppress his prior domestic violence incidents based on the fact that he had not been arrested for any probation violations. But Price's attorneys informed the court that they had seen him in jail 7 to 10 times. Further, disputes over trial strategy or a general dissatisfaction with counsel's performance are generally not sufficient reasons to appoint new counsel. See State v. Varga, 151 Wash.2d 179, 200, 86 P.3d 139 (2004); State v. Cameron, 47 Wash.App. 878, 882-83, 737 P.2d 688 (1987).
¶ 34 Moreover, Price failed to demonstrate how, if at all, the court's ruling prejudiced his case. He argues on appeal that the court erred by failing to "examine whether [his] other complaints might have involved prejudice." Br. of Appellant at 24. But Price was required to establish likely prejudice; the burden is not on the court. In conclusion, the trial court reasonably concluded that Price lacked the financial means to hire a new attorney and that the public's interest in prompt and efficient administration of justice outweighed Price's right to obtain counsel of his choice.

II. Evidentiary Issues
¶ 35 Price next raises several evidentiary issues for this court to consider. We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. State v. Moran, 119 Wash.App. 197, 218, 81 P.3d 122 (2003), review denied, 151 Wash.2d 1032, 95 P.3d 351 (2004). A trial court abuses its discretion when its decision is manifestly unreasonable, or is based upon untenable grounds or reasons. Moran, 119 Wash.App. at 218, 81 P.3d 122.

A. Alford Plea

¶ 36 First, Price argues that the trial court erred in admitting his Alford plea as an admission under ER 801(d)(2) because an Alford plea does not constitute an admission of guilt or a statement against interest. The State responds that under ER 801(d)(2), an "admission" need only be a statement, not an explicit admission of guilt. Br. of Resp't at 23. The State is correct.
¶ 37 Here, the trial court held that pursuant to Mendoza v. Rivera-Chavez, 88 Wash.App. 261, 272, 945 P.2d 232 (1997), an Alford plea constitutes an "admission" for purposes of ER 801(d)(2). 5 RP at 374. ER 801(d)(2) excludes an "Admission by [a] Party-Opponent" from the definition of hearsay and provides that a statement is not hearsay if it is offered against a party and is the party's own statement. As Karl Tegland notes, nothing in ER 801 requires the statement to have been against the declarant's interest when made; an "admission" under ER 801 is simply a statement by a party. See 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 801.35 at 336 (4th ed.1999).
¶ 38 Although Price did not admit guilt in entering an Alford plea, he certainly made a *37 statement. His statement is entitled "STATEMENT OF DEFENDANT ON PLEA OF GUILTY." Ex. 139. It states that he gave up important rights "BY PLEADING GUILTY;" he stated that he understood the "CONSEQUENCES OF [HIS] GUILTY PLEA;" and that he "plead guilty to the crime of Assault 4; Harass DV; Att. [attempted] unlaw. Imprisonment." Ex. 139. He handwrote on the plea: "because the State's evidence is such that I could be convicted anyway, I wish to take advantage of the State's offer and resolve this case today by entering a plea of guilty." Ex. 139. Washington courts have held that the statements made in an Alford plea constitute an admission for purposes of ER 801(d)(2). See Mendoza, 88 Wash.App. at 272, 945 P.2d 232 (an Alford plea is admissible as an "admission"); N.Y. Underwriters Ins. Co. v. Doty, 58 Wash.App. 546, 550-51, 794 P.2d 521 (1990) (holding that, while the doctrine of collateral estoppel does not apply to an Alford plea and an Alford plea is not admissible to establish a party's intent, such a plea does constitute an "admission"). Thus, the trial court's determination was based upon well-established law and was not an abuse of discretion.
¶ 39 Additionally, Price contends in his Statement of Additional Grounds (SAG) that the trial court erred in admitting his Alford plea because it failed to provide proper instructions to the jury on the specific purposes for which the plea was admitted. He also asserts that the State improperly admitted his Alford plea as evidence of a prior bad act under ER 404(b), arguing that the State "made it clear that these prior bad acts of harassment and domestic violence would be the cornerstone of their case against Mr. Price." SAG at 3. This claim is without merit.
¶ 40 Under ER 404(b), evidence of other crimes, wrongs, or acts is inadmissible to prove the character of a person in order to show action in conformity therewith; however, this evidence is admissible for other purposes. Here, the State clearly offered Price's Alford statement on plea of guilty for "[an]other purpose[ ]"  it was offered as evidence of the aggravating circumstance of a pattern or practice of domestic violence incidents perpetrated by Price against Ms. Sheaffer. ER 404(b). Moreover, the court provided a limiting instruction to the jury that it was only to consider this evidence "as it may relate to your consideration of whether the State has proven the aggravating circumstance beyond a reasonable doubt." CP at 71. Thus, not only was the statement properly admitted, its use was properly limited.

B. Ms. Brown's Testimony

¶ 41 Price next contends that the court erred when it sustained the State's relevance and hearsay objections to defense counsel's question of Brown regarding her reason for scheduling a meeting with Price a second time after the murder. Price argues that Brown's testimony was admissible under ER 803(a)(3) because it would show Price's then-existing state of mind and refute any inference that Price fled to Oregon after the murder. The State responds that Price did not properly preserve this claim of error for review. The State is correct.
¶ 42 Here, Brown testified that she met Price in Portland after the murder and that she had planned to meet him a second time in Chehalis, Washington. During cross-examination, defense counsel asked Brown: "What was the purpose of your meeting him the next day?" 7 RP (Jul. 11, 2002) at 503. The prosecutor objected, arguing that Brown's testimony was irrelevant and called for hearsay. In response, defense counsel argued: "Well, I mean she can testify as to why she thinks she was going to meet him. She had a thought in her mind as to why she was going to meet him. That's not hearsay." 7 RP at 503. After a sidebar, the court sustained the objection.
¶ 43 After Brown's testimony concluded, the parties made a record of the sidebar. Defense counsel informed the court that the purpose of his question was to elicit the reason that Brown had intended to meet Price a second time. He further stated that Brown would have testified that "Mr. Price asked her to come down to that area to pick him up, to bring him back north to the Tacoma area." 7 RP at 505. Defense counsel argued that this testimony was not being *38 offered to show the truth of the matter asserted  i.e., that Price had not fled Tacoma after the murder  but simply to show why Brown was planning to meet Price. The prosecutor responded that Price's statements to Brown were inadmissible hearsay and that Brown's purpose for meeting Price was irrelevant to whether Price murdered Ms. Sheaffer.
¶ 44 On appeal, Price asserts a different ground for objection to the court's ruling  that testimony by Brown that he asked her to drive him to Tacoma was admissible because it demonstrates his state of mind at the time he arranged their meeting. A party who objects to the admission of evidence on one ground at trial may not on appeal assert a different ground for excluding that evidence. State v. Kilponen, 47 Wash.App. 912, 918, 737 P.2d 1024, review denied, 109 Wash.2d 1019 (1987). And a theory not presented to the trial court may not be considered on appeal. Kilponen, 47 Wash.App. at 918, 737 P.2d 1024. Thus, Price's claim of error is not properly before this court.
¶ 45 Moreover, even if the trial court had abused its discretion, any error was harmless. Where an error violates an evidentiary rule rather than a constitutional mandate, the error is not prejudicial unless it is reasonably likely that the outcome of the trial would have been materially affected had the error not occurred. State v. Thomas, 150 Wash.2d 821, 871, 83 P.3d 970 (2004). The improper admission of evidence is harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole. Thomas, 150 Wash.2d at 871, 83 P.3d 970. Here, while evidence of flight by Price was certainly relevant to whether he murdered Ms. Sheaffer, the State offered far more incriminating evidence: several witnesses observed a dark-skinned man in his 30s driving away in a black Jetta parked outside Ms. Sheaffer's grandparents' house immediately after the murder and prior to the murder, Price retrieved a gun with ammunition matching the caliber of bullets used to kill Ms. Sheaffer. The evidence here was overwhelming.

C. Becky Sheaffer's Testimony

¶ 46 Price also asserts that the court erred under ER 404(b) by admitting portions of Becky Sheaffer's testimony regarding telephone conversations that she overheard between Price and Ms. Sheaffer. This claim is meritless.
¶ 47 Here, Becky Sheaffer testified that on several occasions she had been alone with Ms. Sheaffer in her car and had overheard phone conversations between Ms. Sheaffer and Price. Becky stated that the voice on the other end of Ms. Sheaffer's phone was very loud and that she recognized the voice as Price's. The prosecutor asked Becky if she had heard what Price said to Ms. Sheaffer on these occasions, and defense counsel objected twice, arguing that Becky's testimony was irrelevant and that it violated ER 404(b) and 403. The court called a sidebar.
¶ 48 During the sidebar, the prosecutor argued that Becky would testify that she had heard Price arguing or quarreling with Ms. Sheaffer on the phone and that the State was offering her testimony as "evidence of quarrels or disputes" between the victim and the defendant in the period of time leading up to the murder. 5 RP at 334. The State argued that the evidence was not being offered to prove action in conformity therewith in violation of ER 404(b), but to establish Price's motive to kill Ms. Sheaffer. The court overruled Price's objection, holding that evidence of previous hostility between the defendant and the victim is relevant to show a motive for assault or murder. Thus, the trial court properly admitted Becky's testimony for "[an]other purpose[ ]" under ER 404(b). Moreover, when the prosecutor resumed questioning Becky regarding these phone calls, defense counsel did not renew his objection. And the court provided the jury with a limiting instruction, which instructed the jury to consider Becky's testimony only as evidence of motive for the murder. The trial court did not abuse its discretion.

D. Dr. Duran's Testimony

¶ 49 Additionally, Price contends that the trial court abused its discretion by permitting *39 Dr. Duran to testify that during his physical examination of Ms. Sheaffer, she identified Price as her attacker. Price argues that this testimony fails to meet the standards of ER 803(a)(4) and thus, is impermissible hearsay. To support this contention, Price asserts that Dr. Duran did not immediately document his examination of Ms. Sheaffer, he did not offer Ms. Sheaffer any discharge or additional services, and he did not bill Ms. Sheaffer. These arguments fail.
¶ 50 Under ER 803(a)(4), the following is excepted from the rule against hearsay:
Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
In determining whether evidence is admissible under ER 803(a)(4), courts consider a two-pronged test: (1) whether the declarant's motive in making the statement was to promote treatment and (2) whether the medical professional reasonably relied on the statement for purposes of treatment. In re the Pers. Restraint of Grasso, 151 Wash.2d 1, 20, 84 P.3d 859 (2004).
¶ 51 As a general rule, statements attributing fault are not relevant to diagnosis or treatment. State v. Sims, 77 Wash.App. 236, 239, 890 P.2d 521 (1995). But a statement attributing fault to an abuser can be reasonably pertinent to treatment in domestic assault cases. Sims, 77 Wash.App. at 239, 890 P.2d 521. A physician's treatment will necessarily differ when the abuser is a member of the victim's family or household; for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove him or herself from the dangerous environment by leaving the home and seeking shelter elsewhere. Sims, 77 Wash.App. at 239, 890 P.2d 521. Therefore, the physician frequently must know the identity of the perpetrator in order to render proper treatment. Sims, 77 Wash.App. at 239-40, 890 P.2d 521.
¶ 52 Here, Dr. Duran informed the court that he noticed that Ms. Sheaffer had injuries on August 25, 2001. He asked Ms. Sheaffer if she wanted him to look at the injuries and, although she initially declined, she later approached him and asked him to examine her. He did not recall billing Ms. Sheaffer and testified that it was his usual practice not to bill co-workers for medical examinations. Dr. Duran asked Ms. Sheaffer about the history of the injuries in order to assess their severity. In addition, because Ms. Sheaffer's injuries involved domestic abuse and would require special treatment, Dr. Duran asked her the identity of her abuser. She informed him that Price had choked her. Dr. Duran did not immediately document his examination of Ms. Sheaffer because she wanted "to keep [his] care off the record." 7 RP at 474. However, the following day, Ms. Sheaffer informed Dr. Duran that she wanted to "make a formal record," and he reviewed her statements from the previous day and documented her exam. 7 RP at 475. In addition, Dr. Duran testified that he discussed counseling and other resources with Ms. Sheaffer, but he did not refer her to any of these services because she informed him that she did not want to attend counseling at that time.
¶ 53 Contrary to Price's assertion, ER 803(a)(4) does not require that a physician or other medical provider bill a patient. In addition, Dr. Duran testified that he discussed counseling and other resources with Ms. Sheaffer and documented Ms. Sheaffer's physical examination after conferring with her the following day. The record supports the trial court's conclusion that Ms. Sheaffer's motive in making her statements to Dr. Duran was to promote treatment and that he, in turn, relied on her statements for purposes of treatment. And Price presents no argument to the contrary. The court did not abuse its discretion.

E. Evidence Regarding Mrs. Price

¶ 54 Price asserts that the trial court erred by admitting evidence of Mrs. Price's physical appearance as rebuttal testimony. At trial in the defendant's case in chief, Smed Wagner, a criminal defense investigator, read *40 Mrs. Price's deposition testimony to the jury. Prior to his testimony, defense counsel argued, "Piarre Price did not shoot Stephanie Sheaffer, and you are going to hear how we know that ... Piarre Price did not have the black Jetta. Someone else had the black Jetta." 9 RP at 632. After Mr. Wagner read Mrs. Price's deposition, the State called him to the stand for rebuttal testimony.
¶ 55 The prosecutor asked Mr. Wagner if he "could ... describe Bernice's physical appearance." 9 RP at 653. Defense counsel objected that this evidence was improper rebuttal testimony. The prosecutor responded that the evidence was proper rebuttal testimony, arguing, "I can see one angle that the defense might try to play is to sit up there in closing argument saying, look, Bernice had the car, she had a motive to kill Stephanie. She had every reason not to like her. How do we know it wasn't her?" 9 RP at 654. The prosecutor further argued that evidence of Mrs. Price's physical appearance was relevant to show that witnesses at the murder scene could not have confused her with Price. The court admitted the evidence, holding that the State did not have an obligation to exclude Mrs. Price as a suspect in its case in chief because her testimony was not introduced to the jury until Mr. Wagner read her deposition. Price argues that the trial court abused its discretion because the defense had not presented any evidence that Mrs. Price was a suspect in Ms. Sheaffer's murder.
¶ 56 Rebuttal evidence is admitted to answer new matters raised by the defense. State v. Swan, 114 Wash.2d 613, 652, 790 P.2d 610 (1990), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). It is not simply a reiteration of the evidence in chief. Swan, 114 Wash.2d at 652, 790 P.2d 610. The reason rebuttal evidence is circumscribed is to prevent a party from withholding substantial evidence merely in order to present this evidence cumulatively at the end of the defendant's case. Swan, 114 Wash.2d at 652, 790 P.2d 610. However, ascertaining whether rebuttal evidence is a reply to new matters may be difficult, and often genuine rebuttal evidence will frequently overlap with the evidence in chief. Swan, 114 Wash.2d at 653, 790 P.2d 610.
¶ 57 Here, the defense "opened the door" with Mrs. Price's deposition testimony to the issue of whether another person  including Price's wife  murdered Ms. Sheaffer. Her testimony was the only evidence suggesting that Price had an alibi and could not have committed the murder. And this testimony invited a possible inference that Mrs. Price had a motive to kill her husband's lover. Thus, the State properly addressed a new issue raised by Price. Further, Mr. Wagner's testimony regarding Mrs. Price's physical appearance was not admissible as part of the State's case in chief because he had not yet read Mrs. Price's deposition into evidence. See Kremer v. Audette, 35 Wash.App. 643, 648, 668 P.2d 1315 (1983). In conclusion, Mr. Wagner's testimony was proper rebuttal testimony and the court did not abuse its discretion by admitting this evidence.

F. Photographs and Exhibits

¶ 58 Price next argues that the court erred by admitting into evidence photographs depicting the crime scene and unmarked exhibits to establish evidence of flight. He asserts that these photos were irrelevant and cumulative. In addition, Price contends that the items in his backpack admitted by the State as evidence of flight were unmarked and were merely speculative as to his guilt.
¶ 59 At trial, Price objected to photographs 40, 52, 54, 55, and 56, arguing that these photos were irrelevant and cumulative. Photo 40 depicts the Alexander's residence from an easterly direction. The photo was taken from a driveway and shows the sidewalk in front of the residence. Ms. Sheaffer is lying on a medical backboard, and there is blood on her face and arms. A set of keys is on the northwest side of the sidewalk and spent shell casing can be seen. There is a pool of blood on the first step leading to the front porch. Photo 52 depicts what is believed to be the Alexander's living room window, which was north of where Ms. Sheaffer was laying. Photo 54 shows spatter on the living room window glass. Photo 52 gives an overall view of the living room window and the wall of the house, whereas photo 54 is a close-up of the window. Photo 55 shows the *41 living room window and blood spatter on the wall below the east end of the window. Photo 56 depicts a close-up of the blood spatter showing two spots on the exterior wall below the east side of the window.
¶ 60 Schlosser testified that he had taken most of the photos from different positions and angles and that, if he took them from the same angle, he had zoomed the camera in and out to obtain different views of the scene. He stated that he takes long-distance photographs to show the general, overall area, and then he takes close-ups of the scene. The court admitted the photographs.
¶ 61 Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. ER 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. ER 403.
¶ 62 These photographs were clearly relevant to Ms. Sheaffer's murder. They show that Ms. Sheaffer was dead, the area in which she was shot, the blood spatter caused by the shots, and one of the spent bullets. Additionally, the photos aided the jury in understanding the crime scene and documented police investigation shortly after the shooting, and they tend to support the State's theory that Price shot Ms. Sheaffer with a .380 caliber gun. In addition, the court did not abuse its discretion in concluding that the admission of five photographs (out of a total of over 65), each showing at least a slightly different view of the crime scene, did not constitute a needless presentation of cumulative evidence that substantially outweighed their probative value.
¶ 63 Also at trial, the State sought to admit items from a backpack, marked exhibit 111, found inside Price's vehicle at the time of his arrest. Detective James Harai of the Pierce County Sheriff's Department testified as to the backpack's contents. He testified that there were numerous hair trimmers, a cell phone and prepaid wireless card, an electric shaver, a travel kit, various grooming products and medications, and compact discs. Defense counsel objected, arguing that, other than the hair trimmers and a few other items, most of the items were not marked. Additionally, he argued that these items were not relevant. The State argued that the evidence was relevant for two reasons: (1) a backpack full of grooming supplies tends to show that the defendant was "on the run" in his vehicle and (2) evidence of the hair trimmers is relevant because the defendant had shaved his hair since the murder, and this evidence supports an inference that he had changed his appearance to avoid detection by police. 5 RP at 409. The State explained that it had not marked the other items in the backpack because "[t]he stuff [wouldn't] even fit back in the bag if [it] put a tag on everything." 5 RP at 410. The court admitted the evidence and instructed the State to put the evidence into one large two-gallon sized Ziploc bag with one exhibit number.
¶ 64 Evidence of flight is generally admissible as tending to show guilt, but the inference of flight must be "substantial and real" not "speculative, conjectural, or fanciful." State v. Bruton, 66 Wash.2d 111, 112, 401 P.2d 340 (1965). The evidence must be sufficient so as to create a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution. Bruton, 66 Wash.2d at 112-13, 401 P.2d 340.
¶ 65 Here, Price's actions in traveling outside Washington State shortly after the murder with a backpack full of grooming supplies, medications, and hair trimmers support a reasonable inference that he left the state to avoid arrest and prosecution. And the hair trimmers are particularly relevant as evidence that Price also changed his appearance to avoid detection by shaving his hair off after the murder. Taken together, this evidence was relevant to Price's consciousness of guilt, and the trial court did not abuse its discretion in admitting this evidence. Moreover, this evidence was properly marked by the State as one, complete exhibit.

*42 III. Unanimity Instruction
¶ 66 Price next contends that the trial court erred when it failed to instruct the jury that it was required to be unanimous as to which acts constituted the aggravating factor supporting his conviction of aggravated first degree murder. Price did not object to the court's instructions on this ground; however, an alleged instructional error in a jury instruction is of sufficient constitutional magnitude to be raised for the first time on appeal. State v. Davis, 141 Wash.2d 798, 866, 10 P.3d 977 (2000). We review de novo the alleged errors of law in a trial court's instructions to the jury. Hue v. Farmboy Spray Co., 127 Wash.2d 67, 92, 896 P.2d 682 (1995).
¶ 67 Here, the State introduced evidence of five prior incidents involving Price and Ms. Sheaffer. The first was an assault based on the charging document and Price's Alford plea for the August 1998 incident; the second was evidence that Price had choked Ms. Sheaffer based on testimony by her sister and Dr. Duran; the third and fourth were evidence that in December 1999, Price ran Ms. Sheaffer off of the road based on testimony by Legett and Grzelka; and the fifth was evidence that Price had pushed Ms. Sheaffer into her car and put her into a headlock in March 2000. Only one incident is challenged as to whether Price previously assaulted Stephanie  the incident in August 1998 to which he entered the Alford plea.
¶ 68 The State charged Price with aggravated first degree murder pursuant to RCW 10.95.020(14). Under that statute, a person is guilty of aggravated first degree murder if he or she commits first degree murder and one or more the following aggravating circumstances exist:
At the time the person committed the murder, the person and the victim were "family or household members"... and the person had previously engaged in a pattern or practice of three or more of the following crimes committed upon the victim within a five-year period, regardless of whether a conviction resulted:
(a) Harassment ...; or
(b) Any criminal assault.
¶ 69 The court provided the following instruction to the jury: "The State has the burden of proving the existence of an aggravating circumstance beyond a reasonable doubt. In order for you to find that there is an aggravating circumstance in this case, you must unanimously agree that the aggravating circumstance has been proved beyond a reasonable doubt." CP at 55. The court did not instruct the jury that it had to be unanimous as to which of Price's five alleged acts constituted the aggravating circumstance.
¶ 70 When the State introduces evidence of more than one act of criminal misconduct that could support a conviction for a single criminal act charged in the information, the State must elect which incident it relies upon as proof of guilt, or, in the alternative, the jury must be instructed that it must be unanimous as to the one or more incidents it relies upon in finding guilt. State v. Handyside, 42 Wash.App. 412, 415, 711 P.2d 379 (1985); State v. Petrich, 101 Wash.2d 566, 572, 683 P.2d 173 (1984). The State argues that, while a unanimity instruction is necessary where multiple acts may form the basis of a crime, such an instruction is not required where multiple acts form the basis of an aggravating circumstance. To support its contention, the State cites Davis, 141 Wash.2d 798, 10 P.3d 977; State v. Lord, 117 Wash.2d 829, 822 P.2d 177 (1991); and In re Personal Restraint of Jeffries, 110 Wash.2d 326, 752 P.2d 1338, cert. denied, 488 U.S. 948, 109 S.Ct. 379, 102 L.Ed.2d 368 (1988). But these cases dealt with alternative statutory means and means within means, not multiple acts committed by the defendant. This case is a "multiple act" case.
¶ 71 The trial court erred when it failed to provide a unanimity instruction, but we consider whether the error was harmless. Failure to provide a unanimity instruction in multiple act cases is harmless if no rational trier of fact could have entertained a reasonable doubt that each incident established the criminal conduct charged in the information beyond a reasonable doubt. State v. Kitchen, 110 Wash.2d 403, 411, 756 P.2d 105 (1988). Here, each act was supported by sufficient evidence. No issue is raised as to *43 four of the assaults, only as to the assault in 1998.
¶ 72 Price contends that the jury could have had a reasonable doubt as to whether he assaulted Ms. Sheaffer in August 1998, because he entered an Alford plea declaring his innocence. This argument fails in two respects. First, under RCW 10.95.020(14), a conviction of harassment or assault is not required; the State must only prove beyond a reasonable doubt that the assault occurred. Moreover, the State met its burden. Deputy Collier testified regarding the August 1998 incident that he observed Ms. Sheaffer with red marks on her neck and a swollen lip and in Price's Alford plea, he admitted that the State's evidence is such that "[he] could be convicted anyway." Ex. 139. The identity of the victim, Ms. Sheaffer, was established by introducing the 1998 criminal complaint, the injury was established by the deputy's testimony, and Price's culpability was established by sufficient evidence in his statement on plea of guilty. No rational trier of fact could have entertained a reasonable doubt that this incident established an assault beyond a reasonable doubt. Thus, the failure to give a unanimity instruction was harmless.

IV. Ineffective Assistance of Counsel
¶ 73 Price next asserts that his trial attorneys were ineffective because they failed to request a limiting instruction regarding the evidence introduced to prove the charged aggravating factor. He argues that the State's evidence of incidents involving Price and Ms. Sheaffer constituted "prior bad acts" under ER 404(b) and that his attorneys were deficient in failing to request an instruction limiting the use of this evidence as proof only of the aggravating circumstance. Br. of Appellant at 38. Price is in error.
¶ 74 In determining whether a defendant received constitutionally sufficient representation, we apply the two-part Strickland test. State v. Tilton, 149 Wash.2d 775, 783-84, 72 P.3d 735 (2003); Strickland v. Wash., 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, Price must show that trial counsel's performance was deficient based on the entire record. Tilton, 149 Wash.2d at 784, 72 P.3d 735; State v. McFarland, 127 Wash.2d 322, 334-35, 899 P.2d 1251 (1995). In making this determination, we presume that the defendant received effective representation. Tilton, 149 Wash.2d at 784, 72 P.3d 735; State v. Brett, 126 Wash.2d 136, 198, 892 P.2d 29 (1995), cert. denied, 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). Representation is not deficient if trial counsel's conduct can be characterized as legitimate trial strategy or tactics. State v. Hendrickson, 129 Wash.2d 61, 77-78, 917 P.2d 563 (1996). Second, Price must show that the deficient performance prejudiced him. Tilton, 149 Wash.2d at 784, 72 P.3d 735. This showing is made when there is a reasonable probability that, but for trial counsel's errors, the result of the trial would have been different. Hendrickson, 129 Wash.2d at 78, 917 P.2d 563. To establish ineffective assistance of counsel, Price must show both prongs of the test. Hendrickson, 129 Wash.2d at 78, 917 P.2d 563.
¶ 75 As noted, the State introduced evidence of five prior incidents involving Price and Ms. Sheaffer. As to the first incident involving Price's Alford plea, Price's attorneys objected on ER 404(b) grounds and the court did give a limiting instruction informing jury that it was only to consider this evidence "as it may relate to your consideration of whether the State has proven the aggravating circumstance beyond a reasonable doubt." CP at 71.
¶ 76 Defense counsel's decision not to request a limiting instruction on the remaining four incidents can reasonably be characterized as trial strategy or tactics. We can presume that counsel did not request a limiting instruction regarding the use of ER 404(b) evidence of prior bad acts because "to do so would reemphasize this damaging evidence" to the jury. State v. Barragan, 102 Wash.App. 754, 762, 9 P.3d 942 (2000); State v. Donald, 68 Wash.App. 543, 551, 844 P.2d 447, review denied, 121 Wash.2d 1024, 854 P.2d 1084 (1993).
¶ 77 Moreover, as the State aptly points out, had Price's attorneys requested a limiting instruction, the State likely would have argued that testimony regarding these incidents was admissible as substantive evidence *44 of the murder under ER 404(b). This argument is supported by the fact that the State successfully argued that Becky Sheaffer's testimony regarding arguments that she had overheard between Price and Ms. Sheaffer was admissible under ER 404(b) as evidence of Price's motive to kill Ms. Sheaffer. The court provided a limiting instruction, informing the jury that it was only to consider Becky's testimony as evidence of motive for the murder. It was a reasonable strategy for Price's attorneys not to request a limiting instruction in order to avoid further instructions emphasizing evidence that he clearly wanted to minimize  i.e., that the jury could consider testimony regarding these incidents as proof of Price's motive to kill Ms. Sheaffer. Thus, Price fails to demonstrate that his trial attorneys were deficient and his claim fails.

V. Sufficiency of the Evidence
¶ 78 Additionally, Price argues that insufficient evidence supports the jury's finding that he committed first degree murder. To support this contention, Price argues that the evidence is too circumstantial. First, none of the witnesses present at the murder scene saw his face or could identify him as the shooter. Moreover, Price contends that evidence that a black man of average height was seen driving away from the scene in a black Jetta, that Price had retrieved a gun of an undetermined caliber and a box of .380 ammunition, that Ms. Sheaffer had ended their relationship, and that various personal items were found in Price's car when he was arrested, was simply insufficient to support his conviction. These arguments are without merit.
¶ 79 Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the State, it permits a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Tilton, 149 Wash.2d at 786, 72 P.3d 735. "A claim of insufficiency admits the truth of the State's evidence and all inferences that can reasonably drawn therefrom." State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence is as reliable as direct evidence. State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980) (emphasis added). We defer to the trier of fact regarding a witness' credibility or conflicting testimony. State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990).
¶ 80 Here, Price committed several acts of domestic assault on Ms. Sheaffer and, in the weeks prior to her murder, he choked her and threatened to kill her. He was angry with her because she asked him to move out of her apartment and he wanted to see their daughter. Shortly before Ms. Sheaffer's murder, Price retrieved a gun and a box of .380 ammunition from a co-worker. The autopsy revealed that Ms. Sheaffer died from gunshot wounds; five .380 caliber bullets were found at the scene, and four of these bullets were found to have come from the same gun. Investigators determined that the shooting was not incident to a robbery because Ms. Sheaffer's keys, purse, and money were left at the scene.
¶ 81 Several witnesses testified that they heard the shooting and observed an average-sized black man in his 30s leaving the scene and hurriedly driving away in a small black car or a black Jetta. Price is a black male of medium build, weighs 180-190 pounds, and is between five foot, eleven inches and six feet tall. He drove a black Jetta at the time of Ms. Sheaffer's murder. In addition, several witnesses testified that Price generally wore his hair short or in braids. After the murder, Price left Washington State. When police apprehended Price, his head was shaved and his vehicle had California State license plates. Inside the vehicle, police found grooming products, medications, and several hair trimmers. Additionally, police found Price's Washington State license plates. Taken as a whole, this evidence overwhelmingly supports the jury's finding that Price murdered Ms. Sheaffer.
¶ 82 Price argues that his wife's testimony demonstrated that he could not have been involved in the shooting because he had taken her car for a test drive and left the black Jetta at her apartment during the time of the murder. However, the jury ultimately found Mrs. Price's testimony to be less credible than the testimony of other witnesses. Credibility determinations are left to the trier *45 of fact and this determination is not reviewable on appeal. Camarillo, 115 Wash.2d at 71, 794 P.2d 850.

VI. Prosecutorial Misconduct
¶ 83 Price contends that the prosecutor committed prosecutorial misconduct during both opening and closing arguments. These claims are without merit.
¶ 84 In order to establish prosecutorial misconduct, Price must prove that the prosecutor's conduct was improper and that the prosecutor's conduct prejudiced his right to a fair trial. State v. Dhaliwal, 150 Wash.2d 559, 578, 79 P.3d 432 (2003). Prejudice is established only where "there is a substantial likelihood the instances of misconduct affected the jury's verdict." Dhaliwal, 150 Wash.2d at 578, 79 P.3d 432 (citing State v. Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995), cert. denied, 518 U.S. 1026, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996)).
¶ 85 During opening statements, the prosecutor argued the following over objection:
Shortly after the police had arrived at the scene of the murder, the defendant had quickly become a prime suspect. He had been violent and abusive to Stephanie in the past, often in front of her family and friends. As the police searched through records, they learned that as far back as August of 1998, the police had responded to where Stephanie was. They noticed that she had injuries to her lip, marks on her neck. She appeared fearful. Police took a report. The defendant would later be charged with assaulting Stephanie, harassing Stephanie, and attempting to unlawfully harass Stephanie. These would be charges that the defendant would plead guilty to.
4 RP at 98.
¶ 86 In addition, the prosecutor argued that on one occasion, "[t]he defendant became enraged, put his hands around her neck, gave her a glimpse of the future, and told her that he was going to kill her, continued to choke her until she passed out." 4 RP at 104.
¶ 87 Price argues that in making these remarks, the prosecutor impermissibly expressed his personal opinion as to the credibility of the witnesses and his guilt. In addition, he argues that by stating that Price had pleaded guilty to a charge of assault, the prosecutor had "shift[ed] the burden in relation to the truthful nature of facts surrounding the defendant's [Alford] plea." SAG at 24. Price also asserts that, by arguing that Price had committed other acts of assault and harassment against Ms. Sheaffer, the prosecutor forced him to prove that "he was not only innocent of the crimes he was charged with, but in addition, crimes and or prior bad acts he was not even on trial for." SAG at 26.
¶ 88 A statement by counsel clearly expressing his personal opinion as to the credibility of a witness or the guilt of the defendant is misconduct. State v. Papadopoulos, 34 Wash.App. 397, 400, 662 P.2d 59 (1983). Misconduct does not occur unless it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion. Papadopoulos, 34 Wash.App. at 400, 662 P.2d 59. Here, the prosecutor's arguments were not "clearly and unmistakably" expressed in the form of personal opinions; rather they were arguments based on the evidence that would be presented at trial. In addition, the prosecutor did not "shift [ ] the burden" regarding the nature of Price's Alford plea. The prosecutor merely argued that Price pleaded guilty to a charge of assault, not that Price actually admitted guilt. Finally, the prosecutor's remarks regarding Price's other acts of violence did not force Price to prove that he was innocent of crimes for which he was not on trial. Price was, in fact, charged with first degree murder with aggravating circumstances, and the State properly argued that testimony by witnesses regarding incidents of prior abuse by Price would prove these circumstances. In sum, Price has failed to show any misconduct by the prosecutor.
¶ 89 During closing arguments, the prosecutor made the following statements with regard to Price's Alford plea:

*46 This document will speak for itself, and you can read through it. It tells you this is an [Alford] plea.
What the defendant says is, "I am not guilty of the crimes of which I am charged; however, because the State's evidence is such that I could be convicted anyway, I wish to take advantage of the State's offer . . .," . . .
. . . The document is somewhat contradictory, and the defense will have you believe that it doesn't prove anything. The fact of the matter is he pled guilty. He said there was sufficient evidence to convict him, and I submit to you that you should go along with that. Take this as an admission of guilt on the part of the defendant.
9 RP at 674-75.
¶ 90 We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. Dhaliwal, 150 Wash.2d at 578, 79 P.3d 432; State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322 (1998). A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury. State v. Hoffman, 116 Wash.2d 51, 94-95, 804 P.2d 577 (1991).
¶ 91 Although Price renewed his objection to the admission of his Alford plea into evidence, Price did not object to the prosecutor's statements. A defendant who fails to object to an improper remark waives the right to assert prosecutorial misconduct unless the remark was so "flagrant and ill intentioned" that it causes enduring and resulting prejudice that a curative instruction could not have remedied. State v. Russell, 125 Wash.2d 24, 86, 882 P.2d 747 (1994), cert. denied, 514 U.S. 1129, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995).
¶ 92 Price again argues that the prosecutor expressed her personal belief regarding Price's guilt. He also argues that she misstated the law by arguing that his Alford plea was an admission of guilt. The prosecutor committed no misconduct. She did not express a personal belief as to Price's guilt but, instead, argued that the jury should infer guilt from his Alford plea. In addition, the prosecutor clearly did not misstate the law. She informed the jury that by entering an Alford plea, Price stated that he was not guilty of the crimes alleged. She then properly argued however, that the jury could infer guilt based on this evidence. Moreover, even if these remarks were improper, they were not "flagrant" or "ill intentioned," and the court instructed the jury that it was not to consider Price's Alford plea as "conclusive evidence that the defendant committed the act identified." CP at 71. This instruction would have remedied any potential prejudice caused by the statements.

VII. Cumulative Error
¶ 93 Finally, Price invokes the cumulative error doctrine, under which a defendant may be entitled to a new trial when errors of counsel cumulatively produce a trial that is fundamentally unfair. State v. Greiff, 141 Wash.2d 910, 929, 10 P.3d 390 (2000). The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary. In re Pers. Restraint of Lord, 123 Wash.2d 296, 332, 868 P.2d 835, cert. denied, 513 U.S. 849, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994). Where no prejudicial error is shown to have occurred, cumulative error cannot be said to have deprived the defendant of a fair trial. State v. Stevens, 58 Wash.App. 478, 498, 794 P.2d 38, review denied, 115 Wash.2d 1025, 802 P.2d 128 (1990). This doctrine has no application here, as Price has failed to show any prejudicial error.
¶ 94 Affirmed.
We concur: QUINN-BRINTNALL, C.J., and VAN DEREN, J.
NOTES
[1] N.C. v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (holding that a defendant may plead guilty while disputing the facts alleged by the prosecution). Washington adopted an Alford plea in State v. Newton, 87 Wash.2d 363, 372, 552 P.2d 682 (1976).
[2] Mrs. Price failed to respond to a subpoena for her testimony at trial.