

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) ) ) | No. 69601-7-I |
| v. | ) ) | |
| MATTHEW ALEXANDER HAMPTON, | ) ) | PUBLISHED OPINION |
| Appellant. | ) ) ) | FILED: August 11, 2014 |

DWYER, J.—"[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25, 109 S. Ct. 2646, 105 L. Ed. 2d 528 (1989). This right provides a particular guarantee: that "the accused be defended by the counsel he believes to be best." United States v. Gonzalez-Lopez, 548 U.S. 140, 146, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006). In this case, Matthew Hampton appeared at trial call and requested to replace his court-appointed counsel with his newly-retained private counsel. He had recently acquired sufficient funds to retain an attorney for his defense, and he moved to continue proceedings to allow time for his new counsel to prepare. The trial court denied Hampton's request. As a result, Hampton was not represented at trial by his retained attorney.

Although the right to counsel of choice may be denied when one or more recognized countervailing conditions are present, in this case, none of those conditions were present and sufficient to overcome Hampton's right to counsel of choice. We therefore hold that the trial court abused its discretion when it denied Hampton's request for a continuance to allow for his retained counsel of choice to substitute for his court-appointed attorney and appear as his lawyer at trial.

Additionally, in this rape in the second degree prosecution, Hampton contends that the jury should not have been instructed on the uncharged, inferior-degree crime of rape in the third degree. We disagree, and hold that the jury was properly instructed on the inferior-degree crime of rape in the third degree. Nonetheless, because the erroneous denial of the right to counsel of choice constitutes structural error, we reverse Hampton's conviction and remand for further proceedings consistent with this opinion.

I

A.B. and Hampton's son Chance[1] dated briefly when A.B. was 13 years old. They became reacquainted approximately five years later in 2010. On January 7, 2011, around 10:00 p.m., A.B. went to Hampton's house with Chance, along with A.B.'s sister, Alicia, and Alicia's friend Kenny. On that evening, Hampton and his wife, Denise, were at home. Upon arrival, A.B., Chance, Alicia, and Kenny went to the Hamptons' garage to play pool and drink beer.

A.B. drank at least three beers and had some wine, but she was unsure of

---

[1] As this case involves three individuals who share the last name "Hampton," our opinion will refer to the defendant as "Hampton" and to the others by his or her first name.

how much she drank. Nonetheless, A.B., Chance, and Hampton believed that A.B. was intoxicated. A.B. became sick after drinking the wine, and she went to an upstairs bathroom to vomit. At approximately 3:00 a.m.,[2] Chance drove Alicia and Kenny to their homes, but A.B. did not leave because she "felt too sick to get up."

Chance returned after 15 to 20 minutes, and A.B. went back into the garage, where Hampton and Chance were playing pool. A.B. sat in a reclining chair in the garage and fell asleep right away. Thereafter, Denise entered the garage to ask Chance if he had checked his work schedule. Eventually, after Hampton suggested he do so, Chance went to his place of work to check his schedule. Chance tried unsuccessfully to wake A.B. before he left. He started to write a note to her, but Hampton offered to let A.B. know where Chance was in the event that A.B. awoke before Chance returned.

After Chance left, the next thing that A.B. remembered was the sensation of her pants being partially removed.[3] The garage was "pitch black," whereas the lights in the garage had been on when A.B. went to sleep. Hampton hovered over A.B., with "his upper chest over [her] chest," and he tried to kiss her neck. Hampton put his fingers in A.B.'s vagina, and A.B. "told him no" and "told him to stop." A.B. knew that the person hovering over was Hampton because she recognized his voice when he said, "I thought that you wanted me," more than once. Hampton's fingers were still in A.B.'s vagina when she spoke, and A.B.

---

[2] Now January 8.
[3] A.B. stated that she remembered "a jerk" when her pant leg was removed.

called out for Chance. Hampton did not stop right away; his fingers remained

inside A.B.'s vagina for "probably a minute or two." A.B. tried unsuccessfully to

push Hampton away. He eventually stopped on his own.

Although A.B. stated that she was "waking up," and that she was not "wide

awake" until she heard Hampton's voice, she also said that she was "definitely

awake" at the point "when his fingers went inside [her]." Furthermore, A.B.

recalled what happened leading up to the point at which Hampton put his fingers

inside her vagina:

> Q: What's the next thing you remember happening after you
> went to sleep?
> A: I woke up, the garage was pitch black, and Matthew
> Hampton was leaning over me, his upper chest over my chest, he
> was trying to kiss my neck, and he ripped off one of my pants legs
> and he stuck his fingers inside me.
> . . .
> Q: How much recollection do you have of the pants being pulled
> off?
> A: I believe that's what woke me up when he jerked my pants
> leg off.
> . . .
> Q: And it sounded like what you were telling us is he was
> pulling the pants off while he had a finger or fingers inside of you, is
> that what you're saying?
> A: No. He put his fingers in after one pants leg came off.
> . . .
> Q: What happened immediately after the pants came down?
> A: That's when he put his fingers inside me.

Although A.B. was unable to recall the sequence as it pertained to two

events—when her pant leg was pulled off and when Hampton leaned over and

put his face by her neck—the balance of A.B.'s testimony indicates that she was

aware of the events in the garage at a point before Hampton put his fingers in her

vagina.[4] Once Hampton stopped, A.B. stood up immediately and put her pant leg back on. She ran into the house and looked for Chance, but she saw only Hampton, smoking a cigarette by the sliding glass door of the living room. A.B. made two phone calls to Chance, one at 4:57 a.m. and one at 4:59 a.m., and she spoke with Chance when he immediately called back. Chance stated that A.B. was crying and sounded upset, but she did not tell him what happened. Later, on February 16, 2011, A.B. reported the incident to the Snohomish County Sheriff's Office.[5] On April 18, 2012, the State charged Hampton with indecent liberties.[6]

---

[4] Q:    And you told the detective that you woke up to Mr. Hampton, Matthew Hampton, hovering and on top of you; correct?
A:    Correct.
. . .
Q:    As this was happening, as you allege this is happening, you're telling the detective you were awake and knew this was happening; correct?
A:    I was aware that it happened, yes.
Q:    And you told the detective and you told us today that you were saying no; right?
A:    I think it's obvious I'm aware that it happened.
Q:    And so you were conscious, you were awake; correct?
A:    I was waking up, yes.
Q:    Well, waking up. This distinction that you're making, were you not conscious or not aware of what was happening?
A:    I was aware that his hands were inside me, yes.
Q:    And you were aware that you say he was over you or on top of you with his face on your neck?
A:    Yes.

[5] Hampton testified to a different version of events in the garage. Hampton asserted that, after Chance left, A.B. woke up "maybe two minutes" later, while Hampton was still in the garage playing pool, and asked where Chance had gone. She approached him, stood close, and touched the left side of his hip "and started to move it . . . in." Hampton grabbed A.B.'s wrist and her arm, and Hampton's pool stick fell to the ground. Hampton scolded her. He asked, "what do you think Chance would say to this?" A.B. "started crying, sobbing." Hampton left the garage and went into the house to shut off the television, put on his pajamas, and smoke a cigarette by the sliding glass door of the living room.

[6] In pertinent part, "[a] person is guilty of indecent liberties when he or she knowingly causes another person who is not his or her spouse to have sexual contact with him or her or another . . . [w]hen the other person is incapable of consent by reason of being mentally defective, mentally incapacitated, or physically helpless." Former RCW 9A.44.100(1)(b) (2013).

Hampton pleaded not guilty to this charge at his arraignment on May 9, 2012, and trial was set for July 13, 2012. However, the State informed Hampton, at an omnibus hearing on June 15, 2012, that it intended to amend the charge against him to rape in the second degree if he did not accept its plea offer. On July 13, 2012, the court entered a trial continuance—agreed to by both parties—until August 31, 2012.[7]

On August 31, 2012, Hampton appeared for trial call and moved to substitute his newly-retained counsel, Anna Goykhman, for appointed counsel, Donald Wackerman—but the motion was made contingent upon the court granting a continuance to allow time for Goykhman to prepare. Goykhman did not believe that she could effectively represent Hampton without a continuance to allow her to prepare. She indicated that Hampton had recently been able to secure the funds to afford private counsel and that Hampton "feels very strongly that he does not have a good relationship . . . with Mr. Wackerman." Goykhman further stated that Hampton preferred "to have counsel of his own choice, which he can now afford." In addition, Wackerman appeared and commented that he and Hampton "have perhaps not had the best relationship." Wackerman also told the trial court that Hampton had "indicated early on in the case that he was interested in retaining counsel," but that "[h]e was not financially able to do that at the outset of the case."

In opposition to the continuance request, the State asserted that "[t]he

---

[7] The record does not show that there were any hearings between July 13 and August 31, 2012.

victim [was] opposed," and asked the court to assign the matter for trial the following week. It stated that Chance "seem[ed] to be aligned with the defendant," and that Chance was interfering with the State's case. Specifically, the prosecutor did not want to allow more time for Chance "to get inside [A.B.'s] head and try to talk her out of it." However, the State also remarked to the court that "[t]he law is pretty clear that you have discretion to decide it either way, and nobody is really going to have a whole lot of complaint about that whatever you decide."

The court denied the continuance:

> I guess I'm not so persuaded. I know Mr. Wackerman is a very capable attorney. It wouldn't be the first time he's represented someone who may not have always been happy with Mr. Wackerman. I think that happens for most of the defense attorneys that they occasionally have a client who would rather have a different attorney appointed. I don't think that would in any way impair his ability to represent his client zealously and capably, and I don't think there's any question that Mr. Wackerman is a highly qualified criminal defense attorney.
>
> And I'm not really being given much reason other than apparently some other source decided to provide the funds today when it was still a serious case. These cases, uniquely the Court is asking to take into consideration the victim's position on a continuance and for the same reasons that I'm being urged to continue on behalf of the defendant would apply also to the victim. This is a case that's difficult for everybody. I assume it has some impact on the family situation for the defendant. And I don't think that a compelling record has been made as to why the Court essentially on the day of trial should grant a continuance of a case that has already been continued. And, frankly, we have a lot of cases that are even older. This case is past its original speedy trial period and it's been continued at least once already.

In ruling on the continuance request, the court mentioned that the case

No. 69601-7-I/8

had "been continued at least one time."[8] However, the court was willing to grant

a continuance if the parties were not able to interview Chance before trial:

> I guess if these interviews cannot happen that need to
> happen before Wednesday, that would be grounds for continuance.
> But I'm not inclined to grant this continuance at this late of stage
> when there is competent counsel who is prepared to go forward.
> And while it's a very serious charge from what I read, it's not a
> complicated case in terms of the number of witnesses and there's
> no experts I don't think involved in the case.

The following Wednesday, September 5, 2012, Hampton proceeded to

trial with Wackerman as his attorney. The State filed an amended information,

prior to trial commencing, charging Hampton with rape in the second degree,[9]

rather than indecent liberties.

At the close of evidence, the State proposed that the court instruct the jury

on the offense of rape in the third degree.[10] Over Hampton's objection, the court

instructed the jury on both rape crimes. The jury found Hampton not guilty of

rape in the second degree and guilty of rape in the third degree.

Hampton appeals.

---

[8] In fact, the case had been continued only once, by mutual agreement of the parties.

[9] Rape in the second degree, in pertinent part, is established when, "under circumstances not constituting rape in the first degree, [a] person engages in sexual intercourse with another person . . . [w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." RCW 9A.44.050(1)(b).

[10] In pertinent part,
> [a] person is guilty of rape in the third degree when, under circumstances not
> constituting rape in the first or second degrees, such person engages in sexual
> intercourse with another person, not married to the perpetrator . . . [w]here the
> victim did not consent . . . to sexual intercourse with the perpetrator and such
> lack of consent was clearly expressed by the victim's words or conduct.
Former RCW 9A.44.060(1)(a) (2013).

The statute quoted above sets forth the offense of rape in the third degree as it formerly existed. In 2013, the legislature amended the definition of the offense to remove the requirement that the victim not be married to the perpetrator. See Laws of 2013, ch. 94, § 1. In this case, the change in the statute is not of consequence.

- 8 -

II

Hampton contends that his Sixth Amendment right to counsel of choice was erroneously denied. This occurred, he asserts, when the trial court denied his request for a continuance to allow time for his newly-retained private counsel to prepare for trial, forcing him to instead go to trial represented by his court-appointed lawyer. We agree.

A

The Sixth Amendment and article 1, section 22 of the Washington Constitution guarantee the accused the right to counsel.[11] "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." Gonzalez-Lopez, 548 U.S. at 144 (citing Wheat v. United States, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); Powell v. Alabama, 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 (1932)). The right to counsel of choice "'guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.'" Gonzalez-Lopez, 548 U.S. at 144 (quoting Caplin & Drysdale, 491 U.S. at 624-25).

---

[11] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of counsel for his defense," while article I, section 22 of the Washington Constitution provides that "[i]n criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel. " The right to counsel guaranteed in article 1, section 22 of the Washington Constitution provides the same protection as the Sixth Amendment. State v. Medlock, 86 Wn. App. 89, 99, 935 P.2d 693 (1997) (holding that there is "no basis to conclude CONST. art. I, § 22 (amend.10) should be interpreted so as to provide more protection than the Sixth Amendment").

Moreover, the right to counsel of choice "commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best." Gonzalez-Lopez, 548 U.S. at 146. Indeed, "'[t]he Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause.'" Gonzalez-Lopez, 548 U.S. at 146 (quoting Strickland v. Washington, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

The deprivation of a defendant's right to counsel of choice is

"complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed.

Gonzalez-Lopez, 548 U.S. at 148.

Providing an effective court-appointed lawyer is not a constitutionally-acceptable substitute for the defendant's counsel of choice.

The right to select counsel of one's choice, by contrast, has never been derived from the Sixth Amendment's purpose of ensuring a fair trial. It has been regarded as the root meaning of the constitutional guarantee. See Wheat, 486 U.S. at 159; Andersen v. Treat, 172 U.S. 24[,19 S. Ct. 67, 43 L. Ed. 351] (1898). See generally W. Beaney, The Right to Counsel in American Courts 18–24, 27–33 (1955). Cf. Powell, [287 U.S.] at 53. Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation.

Gonzalez-Lopez, 548 U.S. at 147-48 (footnote omitted).

Writing for the Court in Gonzalez-Lopez, Justice Scalia noted that, in Wheat,

> where we formulated the right to counsel of choice and discussed some of the limitations upon it, we took note of the overarching purpose of fair trial in holding that the trial court has discretion to disallow a first choice of counsel that would create serious risk of conflict of interest. [Wheat, 486 U.S.] at 159. It is one thing to conclude that the right to counsel of choice may be limited by the need for fair trial, but quite another to say that the right does not exist unless its denial renders the trial unfair.

Gonzalez-Lopez, 548 U.S. at 147 n.3.

Nevertheless,

> [t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects. Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court. Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government.

Wheat, 486 U.S. at 159 (footnote omitted).

Although courts "must recognize a presumption in favor of [a defendant's] counsel of choice, . . . that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." Wheat, 486 U.S. at 164. "Thus, where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver,

- 11 -

and insist that defendants be separately represented."[12] Wheat, 486 U.S. at 162.

Additionally, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." Gonzalez-Lopez, 548 U.S. at 151 (citing Wheat, 486 U.S. at 159; Caplin & Drysdale, 491 U.S. at 624, 626). The Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, [Wheat, 486 U.S.] at 163-64, and against the demands of its calendar, Morris v. Slappy, 461 U.S. 1, 11-12[, 103 S. Ct. 1610, 75 L. Ed. 2d 610] (1983)." Gonzalez-Lopez, 548 U.S. at 152. Although "no . . . flat rule can be deduced from the Sixth Amendment presumption in favor of counsel of choice," courts "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160.

## B

In Washington, when "considering such motions, the trial court must weigh the defendant's right to choose his counsel against the public's interest in the prompt and efficient administration of justice." State v. Aguirre, 168 Wn.2d 350, 365, 229 P.3d 669 (2010). More specifically, for a request of this nature, Washington courts have considered and applied four factors:

---

[12] For instance, as explained in Wheat, "the District Court was confronted not simply with an attorney who wished to represent two coequal defendants in a straightforward criminal prosecution; rather, [the attorney] proposed to defend three conspirators of varying stature in a complex drug distribution scheme." 486 U.S. at 163-64.

(1) whether the court had granted previous continuances at the defendant's request; (2) whether the defendant had some legitimate cause for dissatisfaction with counsel, even though it fell short of likely incompetent representation; (3) whether available counsel is prepared to go to trial; and (4) whether the denial of the motion is likely to result in identifiable prejudice to the defendant's case of a material or substantial nature.

State v. Price, 126 Wn. App. 617, 632, 109 P.3d 27 (2005) (citing State v. Roth, 75 Wn. App. 808, 825, 881 P.2d 268 (1994)).

This four-factor test is first found in our decision in Roth, 75 Wn. App. at 825.[13] The factors were applied along with an abuse-of-discretion standard to evaluate a trial court's decision to deny a continuance requested in order to allow for both of Roth's private attorneys to be present during jury selection, rather than only one. We referenced "a host of factors for determining whether the denial of a continuance unjustifiably interferes with the right to counsel of choice,"[14] Roth, 75 Wn. App. at 825, and observed that, "'[a] defendant's right to retained counsel of his choice doesn't include the right to unduly delay the proceedings.'" Roth, 75 Wn. App. at 824 (alteration in original) (quoting United States v. Lillie, 989 F.2d

---

[13] In its brief, the State identifies and relies upon factors that are to be considered when a court evaluates a request to substitute one court-appointed counsel for another court-appointed counsel: "(1) the extent of the conflict, (2) the adequacy of the inquiry, and (3) the timeliness of the motion." In re Pers. Restraint of Stenson, 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (citing United States v. Moore, 159 F.3d 1154, 1158-59 (9th Cir. 1998)). These factors are inapplicable in this case.

> Because an additional constitutional right is at stake, . . . motions [to substitute retained counsel for appointed counsel] have never been governed by the three-part extent-of-conflict analysis applicable to defendants seeking new court-appointed counsel. Unless the substitution would cause significant delay or inefficiency or run afoul of . . . other considerations . . . a defendant can fire his retained or appointed lawyer and retain a new attorney for any reason or no reason.

United States v. Rivera-Corona, 618 F.3d 976, 979-80 (9th Cir. 2010) (citation omitted).

[14] The Roth court derived its four-part test from the analysis in 2 WAYNE R. LaFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 11.4, at 39-40 (1984). Therein, the authors discussed 11 factors they deemed pertinent.

The Washington Supreme Court has never adopted this four-part test.

- 13 -

1054, 1056 (9th Cir. 1993)). Notably, we held that "the inability of the defendant to establish likely prejudice at the motion for continuance weighs heavily in the trial court's balance of the competing considerations." Roth, 75 Wn. App. at 826.

Later, Division Two applied the four Roth factors in holding that "disputes over trial strategy or a general dissatisfaction with counsel's performance are generally not sufficient reasons to appoint new counsel."[15] Price, 126 Wn. App. at 634. For this proposition, the Price court cited to two cases that applied ineffective-assistance-of-counsel analysis.[16]

Additionally, the defendant in Price had not raised the funds necessary to hire a private attorney, nor had he yet contacted one, when the trial court evaluated his request for a continuance made on the second day of trial. 126 Wn. App. at 633. Thus, the Price court had reasons—independent of any of one the Roth factors, and consistent with the holding in Gonzalez-Lopez—to deny the defendant's request. This is so because the right to counsel of choice is qualified by the defendant's ability to secure counsel, whether the defendant hires counsel or counsel chooses to represent the defendant without remuneration. Gonzalez-Lopez, 548 U.S. at 144. Furthermore, in Price, the jury had already been sworn when the defendant made his request to substitute in a private attorney, whom he had not yet identified. 126 Wn. App. at 633.

---

[15] In fact, in Price, the defendant was seeking to retain private counsel, not to have one court-appointed attorney substituted for another. 126 Wn. App. at 629-30.

[16] State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004), and State v. Cameron, 47 Wn. App. 878, 882-83, 737 P.2d 688 (1987).

Unfortunately, the decisions in Roth and Price, which invite inquiry into whether the defendant has a legitimate dissatisfaction with appointed counsel (second factor) and whether the denial of the defendant's motion will result in material or substantial prejudice (fourth factor), are incompatible with the United States Supreme Court's explication of a defendant's right to counsel of choice.

In light of Gonzalez-Lopez, the second Roth factor—the legitimacy of the defendant's dissatisfaction with appointed counsel—is an improper consideration when a court evaluates a defendant's request for counsel of choice. Indeed, the right "commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel *he believes to be best.*" Gonzalez-Lopez, 548 U.S. at 146 (emphasis added). Thus, a defendant who hires an attorney whom he or she prefers—subject to qualifications recognized in Gonzalez-Lopez—retains the Sixth Amendment right to be represented by that attorney without regard to a trial court's assessment of the legitimacy of the defendant's dissatisfaction with present counsel. See United States v. Rivera-Corona, 618 F.3d 976, 980 (9th Cir. 2010) ("a defendant can fire his retained *or* appointed lawyer and retain a new attorney for any reason or no reason").

In addition, the fourth Roth factor—whether the denial of the motion to continue to facilitate substitution of retained counsel is likely to result in identifiable prejudice to the defendant's case of a material or substantial nature— is also an improper consideration. The right to counsel of choice is not dependent on the quality of the representation being provided by present

counsel. Gonzalez-Lopez, 548 U.S. at 148. Importantly, "the purpose of the rights set forth [in the Sixth] Amendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair." Gonzalez-Lopez, 548 U.S. at 145. Indeed, the Court in Gonzalez-Lopez rejected the contention "that the Sixth Amendment violation is not 'complete' unless the defendant can show that substitute counsel was ineffective within the meaning of Strickland v. Washington, 466 U.S. 668, 691-696."[17] Gonzalez-Lopez, 548 U.S. at 144. Instead, "[w]here the right to be assisted by counsel of one's choice is wrongly denied . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." Gonzalez-Lopez, 548 U.S. at

---

[17] In Gonzalez-Lopez, Justice Scalia refuted the Government's characterization of the Sixth Amendment right to counsel of choice with reference to the same amendment's Confrontation Clause: "A trial is not unfair and thus the Sixth Amendment is not violated, the Government reasons, unless a defendant has been prejudiced." Gonzalez-Lopez, 548 U.S. at 145. In rejecting this assertion, Justice Scalia opined,

> [w]hat the Government urges upon us here is what was urged upon us (successfully, at one time, see Ohio v. Roberts, 448 U.S. 56[, 100 S. Ct. 2531, 65 L. Ed. 2d 597] (1980)) with regard to the Sixth Amendment's right of confrontation—a line of reasoning that "abstracts from the right to its purposes, and then eliminates the right." Maryland v. Craig, 497 U.S. 836, 862[, 110 S. Ct. 3157, 111 L. Ed. 2d 666] (1990) (SCALIA, J., dissenting). Since, it was argued, the purpose of the Confrontation Clause was to ensure the reliability of evidence, so long as the testimonial hearsay bore "indicia of reliability," the Confrontation Clause was not violated. See Roberts, supra, at 65-66. We rejected that argument (and our prior cases that had accepted it) in Crawford v. Washington, 541 U.S. 36[, 124 S. Ct. 1354, 158 L. Ed. 2d 177] (2004), saying that the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." Id., at 61.

Gonzalez-Lopez, 548 U.S. at 145-46.

Justice Scalia's majority opinion in Gonzalez-Lopez is consonant with his majority opinion in Crawford, a case in which the Sixth Amendment right to confrontation was explicated in much the same way as the right to counsel of choice:

> To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. . . . The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

Crawford, 541 U.S. at 61.

148. It follows that a trial court errs by searching for the likelihood of "identifiable prejudice to the defendant's case of a material or substantial nature" when evaluating a defendant's request to continue proceedings in order to substitute retained counsel of choice for present counsel. Roth, 75 Wn. App. at 825.

The second and fourth factors applied in Roth and Price cannot be reconciled with a defendant's right to hire and be represented by the "counsel he believes to be best." Gonzalez-Lopez, 548 U.S. at 146. In other words, when a trial court considers a continuance requested to facilitate the substitution of a defendant's retained counsel of choice for present counsel, United States Supreme Court precedent precludes application of these two factors.

C

Here, when the trial court ruled on Hampton's request to substitute retained attorney Goykhman for appointed attorney Wackerman and continue the matter to allow Goykhman to prepare, it appears to have, understandably, endeavored to apply the factors found in Roth and Price. First, the trial court noted that the trial date had been continued one time, although it did not note that the sole continuance had been granted at the request of both parties. Second, the trial court acknowledged Hampton's dissatisfaction with Wackerman, but minimized its importance, stating, "I think that happens for most of the defense attorneys that they occasionally have a client who would rather have a different attorney appointed." As discussed above, this evaluation of the defendant's dissatisfaction, although invited by Roth, is precluded by Gonzalez-Lopez.

Third, the trial court noted that Wackerman was ready for trial but that Goykhman was not, a factor that weighed against Hampton's request. However, the trial court made no inquiry as to how much time Goykhman would have needed in order to prepare. Finally, the trial court stated of Wackerman: "I don't think that would in any way impair his ability to represent his client zealously and capably, and I don't think there's any question that Mr. Wackerman is a highly qualified criminal defense attorney." This evaluation of attorney effectiveness and potential prejudice, while endorsed by Roth, is precluded by Gonzalez-Lopez.

In summary, the trial court's consideration of the issue, hewing, as it did, to the factors set forth in Roth, and consisting of the misattributed continuance (first factor) and the disapproved factors (second and fourth factors), leaves only attorney Goykhman's need for time to prepare as a reason for denial of the request that she be allowed time to do just that. Unfortunately, instead of inquiring into how much time Goykhman would need to prepare, the trial court relied upon the misattributed and disapproved factors in denying Hampton's continuance request and, thus, his ability to be represented at trial by his counsel of choice.

To be sure, the right to counsel of choice, as explicated in Gonzalez-Lopez, does not preclude courts from limiting "'[a] defendant's right to retained counsel of his choice [when it would] unduly delay the proceedings.'" Roth, 75 Wn. App. at 824 (first alteration in original) (quoting Lillie, 989 F.2d at 1056). But see Bradley v. Henry, 510 F.3d 1093, 1097 (9th Cir. 2007) (indicating that the

- 18 -

trial court's denial of counsel of choice was "objectively unreasonable" when "21 months of delay resulted from actions of the court [and] one month [was] from Bradley's request to change counsel"). Necessarily, the trial court may consider the demands of its calendar. Gonzalez-Lopez, 548 U.S. at 152.

However, in this case, the sole continuance that was granted was made at the request of both parties. When the trial court denied the request at issue herein, its reasoning—"we have a lot of cases that are even older"—was confusing and inconsistent with its conclusion. Hampton had no scheduled court appearances between July 13, 2012, when the sole continuance was mutually agreed to, and the trial call hearing on August 31, 2012. Even with the agreed continuance, fewer than four months had passed between Hampton's May 9, 2012 arraignment and the trial call hearing at which his newly-retained attorney appeared and at which his continuance request to allow for her preparation was denied.

It is unsurprising that a defendant who is without sufficient funds to hire a private attorney when he is arraigned could, over a period of several months, acquire such funds—especially upon learning that the charge against him is to be amended from indecent liberties to the more serious offense of rape in the second degree.[18] Indeed, at the first court appearance after the sole continuance

---

[18] More than 80 years ago, the United States Supreme Court recognized that defendants may need time to acquire the services of counsel of choice. "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." Powell, 287 U.S. at 53.

was granted (and before the information was actually amended), Hampton appeared in court with newly retained counsel (consistent with his intent from the outset as expressed to his court-appointed lawyer) requesting a continuance to allow his chosen attorney time to prepare.

On appeal, the State asserts that the continuance was properly denied because "there was evidence that the complaining witness was being pressured to not cooperate with the prosecution, thereby jeopardizing the State's case." While such a concern (but not evidence of such a concern) was mentioned at the trial call hearing, the trial court did not find that fact to be so and did not mention this concern in explaining its decision. It does not appear to have been part of the trial court's reasoning. This is understandable, given that the prosecutor summarized the state's position as being that, "nobody is really going to have a whole lot of complaint about that whatever you decide." This statement was made immediately before the trial court ruled on Hampton's continuance request, and its existence in the record undermines the State's present contention that concern for possible impact on the truth-seeking function of the trial served as a basis for the denial of the continuance request.

A trial court's decision denying a requested continuance in order to allow for the substitution of counsel of choice will be reversed only for abuse of discretion. Aguirre, 168 Wn.2d at 365. However, a trial court necessarily abuses its discretion when it bases its ruling on an erroneous view of the law or where it applies the wrong legal standard. State v. Rafay, 167 Wn.2d 644, 655, 222 P.3d 86 (2009). Here, following Roth, the trial court applied a method of analysis

No. 69601-7-I/21

precluded by controlling United States Supreme Court precedent. Thus, we

conclude that the trial court erred by denying Hampton's motion. Because the

deprivation of counsel of choice constitutes "structural error," Hampton is entitled

to a new trial.[19]

III

We next consider Hampton's remaining assignment of error. He contends

that the trial court erred in this prosecution for rape in the second degree by

instructing the jury on the inferior-degree crime of rape in the third degree. This

is so, Hampton asserts, because the evidence was not susceptible to a jury

finding that he committed only rape in the third degree, to the exclusion of rape in

the second degree. We disagree.

"Generally, a criminal defendant may only be convicted of crimes charged

in the State's information." State v. Corey, ___ Wn. App.___, 325 P.3d 250, 252

---

[19] Structural errors "'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" Gonzalez-Lopez, 548 U.S. at 148 (alteration in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 309-10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). As the Court explained,
> [w]e have little trouble concluding that erroneous deprivation of the right to counsel of choice, "with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the "framework within which the trial proceeds," Fulminante, supra, at 310—or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.

Gonzalez-Lopez, 548 U.S. at 150 (citation omitted).

- 21 -

(2014) (citing State v. Tamalini, 134 Wn.2d 725, 731, 953 P.2d 450 (1998)).

However, RCW 10.61.003 permits, "[u]pon an indictment or information for an

offense consisting of different degrees, the jury [to] find the defendant not guilty

of the degree charged in the indictment or information, and guilty of any degree

inferior thereto." More specifically, the trial court may instruct the jury on an

inferior-degree offense when

> "(1) the statutes for both the charged offense and the proposed
> inferior degree offense 'proscribe but one offense'; (2) the
> information charges an offense that is divided into degrees, and the
> proposed offense is an inferior degree of the charged offense; and
> (3) there is evidence that the defendant committed only the inferior
> offense."

State v. Fernandez-Medina, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (quoting

State v. Peterson, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)). The decision

whether to instruct the jury on an inferior-degree offense, which involves

application of law to facts, is reviewed de novo. Corey, 325 P.3d at 253 (citing

Fernandez–Medina, 141 Wn.2d at 454; State v. Dearbone, 125 Wn.2d 173, 178,

883 P.2d 303 (1994)). We view the evidence in the light most favorable to the

party who requested the instruction. Fernandez-Medina, 141 Wn.2d at 455-56.

Rape in the third degree is an inferior-degree offense, not a lesser-

included offense, of rape in the second degree. State v. Wright, 152 Wn. App.

64, 71, 214 P.3d 968 (2009); State v. Ieremia, 78 Wn. App. 746, 753-54, 899

P.2d 16 (1995). On appeal, the parties dispute only the last of the three

elements. This third element, as articulated in Fernandez-Medina, "includes a

requirement that there be a factual showing more particularized than that required for other jury instructions." 141 Wn.2d at 455.

However, "[i]f interpreted too literally . . . the factual test would impose a redundant and unnecessary requirement because all jury instructions must be supported by sufficient evidence." Fernandez-Medina, 141 Wn.2d at 455. Importantly, when considering all of the evidence, it "must raise an inference that *only* the . . . inferior degree offense was committed to the exclusion of the charged offense." Fernandez-Medina, 141 Wn.2d at 455. The evidence must affirmatively establish that the defendant committed the inferior-degree offense. Corey, 325 P.3d at 253 (citing Fernandez–Medina, 141 Wn.2d at 456). "[I]t is not enough that the jury might disbelieve the evidence pointing to guilt." Fernandez-Medina, 141 Wn.2d at 456 (citing State v. Fowler, 114 Wn.2d 59, 67, 785 P.2d 808 (1990), overruled on other grounds by State v. Blair, 117 Wn.2d 479, 816 P.2d 718 (1991)).

On appeal, Hampton relies on the following three cases in which the court held that either the defendant's third-degree rape instruction was properly denied, or that the State's third-degree rape instruction was erroneously given: State v. Charles, 126 Wn.2d 353, 894 P.2d 558 (1995); Wright, 152 Wn. App. 64; and Ieremia, 78 Wn. App. 746. However, Charles, Wright, and Ieremia are inapposite. In each case, neither the State nor the defendant presented affirmative evidence of third-degree rape—that is, unforced sexual intercourse where the victim expressed lack of consent by words or conduct. Instead, the evidence in each case supported a theory of sexual intercourse by forcible

compulsion, and in each case the defendant testified that the sexual intercourse was consensual.[20]

In this case, taken in the light most favorable to the State, the evidence supported the inference that *only* rape in the third degree occurred. A.B. expressed the words "no" and "stop" to Hampton after he digitally penetrated her vagina. She called out for Chance. Although A.B. stated that she was "waking up," she also stated that she was "definitely awake" at the point of penetration. Before penetration, she perceived and understood that her pant leg was being removed. A.B. could feel Hampton's upper chest over hers while he tried to kiss her neck, and she tried to push Hampton away. Because Hampton testified that no sexual intercourse took place, his testimony did not negate or contradict the inference arising from the State's evidence that only rape in the third degree occurred to the exclusion of rape in the second degree.

A recent case, Corey, 325 P.3d 250, is instructive. Therein, the appellate court held that a third-degree rape instruction, given at a rape-in-the-second-degree trial over defense objection, was proper where the evidence heard by the jury included the victim's testimony of unforced, nonconsensual intercourse. Corey, 325 P.3d at 254. Here, the jury could find that the evidence affirmatively established that A.B. expressed her lack of consent (an element of rape in the third degree), not that she was incapable of consent (an element of rape in the

---

[20] To be precise, in Wright, the State charged two defendants with rape in the second degree. One defendant asserted that he and the victim had consensual sex, and the other defendant asserted that he did not have sexual contact with that same victim. Wright, 152 Wn. App. at 67.

second degree, as charged). This supported the inference that Hampton committed only the inferior-degree offense. Therefore, the trial court did not err by instructing the jury on rape in the third degree.[21]

    Reversed and remanded.

We concur:

---

[21] Of course, double jeopardy precludes Hampton's retrial on the allegation of rape in the second degree. The jury's acquittal on that charge is final. Evans v. Michigan, ___, U.S.___, 133 S. Ct. 1069, 1074-75, 185 L. Ed. 2d 124 (2013); Richardson v. United States, 468 U.S. 317, 325, 104 S. Ct. 3081, 82 L. Ed. 2d 242 (1984); United States v. Ball, 163 U.S. 662, 671, 16 S. Ct. 1192, 41 L. Ed. 300 (1896).