IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>SCOTT ELWIN SPRINGSTUN,<br><br>Appellant. | No. 85699-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — Scott Elwin Springstun appeals his conviction for one count of rape in the second degree and avers that the court's authorization of a midtrial amendment of the charging instrument prejudiced his defense and the named victim's disclosure was untimely and, thus, improperly admitted. Because he fails to establish reversible error, we affirm.

FACTS

Mindy Martinez married Joseph Broome in 1992, and they later had a daughter, A.B. Broome's sister, Dina Klasing met Scott Springstun in 1990, began dating sometime thereafter, and they married in 1996. Martinez has known Springstun and Klasing for over thirty years. The four were close, frequently spending time together, but drifted apart after Martinez and Broome divorced and Klasing and Springstun did as well. Despite this, Martinez remains close with Klasing.

Martinez lost contact with Springstun until he called her in the spring or summer of 2018. At the time, he had been living with his cousin, but after an argument, he started living in his truck. The parties dispute some facts about the events that unfolded around this time.[1] Martinez later testified that she invited Springstun to stay with her, and he moved in around May or June 2018. Springstun, however, testified that he moved into Martinez' home during the third week of July, stayed for about five weeks, and left at the end of August.

Shortly after Springstun moved in, A.B. and her son, J, also came to stay with Martinez. Springstun slept in a recliner in the living room, while A.B. and J shared Martinez' bed. Martinez worked nights and slept during the day. A.B. testified that Springstun stayed with them for a total of eight months, including five or six months after she and her son moved in.

At first, everything seemed to be going well, but tensions rose when Springstun began criticizing A.B.'s relationship with her fiancé. The parties also disputed whether Springstun also made comments about A.B.'s appearance and the fact that they were not biologically related. A.B. testified that Springstun started drinking more frequently, becoming loud and aggressive. Springstun admitted to drinking that summer, but claimed it was only a couple of beers each day. A.B. stated that she also drank wine a few times a week with dinner and with friends on weekends.

The State's witnesses generally testified that in August 2019, after a family gathering, A.B. told Martinez and Klasing that Springstun had raped her a year

---

[1] The State's trial memorandum and response brief on appeal portray the events differently and cite to the conflicting testimony at trial.

earlier when he was staying with them. A.B. testified that on a Saturday night, after having a few drinks with dinner, she put her son to bed and fell asleep next to him. Later, she woke up to find Springstun on top of her, touching and penetrating her. At first, she thought it was her fiancé, but upon opening her eyes, she realized it was Springstun. Her underwear had been pushed down to her feet and she had no memory of moving them. She immediately pushed Springstun off of her with her hands and knees, telling him to stop. The penetration lasted four to five seconds, and she could smell alcohol on him. He stopped, but acted confused; A.B. testified that "he acted like he didn't understand what the big deal was."

When A.B. threatened to tell the family, Springstun offered to buy groceries and alcohol for them. During an October 2022 defense interview, A.B. explained that when she told Springstun to move out or she would "say something," he attempted to downplay the incident, emphasizing that they were not related by blood. The entire exchange lasted a few minutes before he left the bedroom, and A.B. locked the door behind him. Springstun completely denied this version of events.

The parties' accounts of the events also differed on whether Martinez and A.B. asked Springstun to leave and if he notified Martinez before moving out. A.B. testified that she felt conflicted about whether to call the police or tell her family. When she woke up the next morning around 8:30 or 9:00 a.m., Springstun was gone. She did not see him again until trial.

After A.B. disclosed the rape to them, Martinez and Klasing immediately went to confront Springstun. Martinez testified that when she asked him whether he raped A.B., he responded, "Yeah, but I bought her groceries." Martinez and Klasing interpreted this statement as an admission; that the groceries were meant to make up for the incident with A.B. At trial, Springstun denied the accusation and claimed he brought groceries to remedy his abrupt departure from Martinez' home and had only mentioned the groceries to Martinez and Klasing in order to explain why he returned shortly after he had moved out. Martinez and A.B. did not recall him bringing groceries. Springstun did not offer any other evidence that he returned to the house and claimed that he had deleted text messages that would have confirmed it.

On February 26, 2021, the State charged Springstun with one count of rape in the second degree, an alternate means crime, and specifically alleged that A.B. was incapable of consenting by reason of being mentally incapacitated and physically helpless.

Two years later, on May 2, 2023, the State moved to amend the information based on A.B.'s recounting of the incident during the defense interview on October 21, 2022. The State's amended information charged Springstun with one count of rape in the second degree by forcible compulsion or, alternatively, one count of rape in the third degree based on lack of consent. Defense counsel did not object to the amendment and stated that they have been on notice of that possibility since October.

Springstun moved pretrial to exclude fact of complaint evidence and prevent testimony regarding A.B.'s disclosure to her family roughly a year after the rape allegedly occurred. The State expressly moved to admit testimony from Martinez and Klasing that A.B. disclosed the rape to them. It argued that her disclosure was admissible as nonhearsay to explain Martinez and Klasing's actions in confronting Springstun and, alternatively, it was admissible under the fact of complaint doctrine. Springstun maintained that A.B.'s disclosure was hearsay and untimely such that the fact of complaint doctrine did not apply.

The State contended that A.B.'s delay in reporting was reasonable because she had not thought about Springstun for a year until the family gathering triggered her memory, at which point she immediately reported the rape to her mother and aunt. After considering the arguments of the parties, the trial court allowed Martinez and Klasing to testify about A.B.'s disclosure and gave a limiting instruction to the jury regarding the evidence.

Trial commenced in May 2023. At the conclusion of the first day of testimony, the State notified Springstun's counsel of its intent to again amend the information. The next morning, on May 16, the State formally moved to amend the information on the record, but because Springstun was ill and had appeared for trial by phone, the court recessed for the day without hearing the motion. The following morning, with Springstun present in person, the court heard and granted the motion. The second amended information reinstated the original charge of one count of rape in the second degree, again alleging that A.B. was incapable of

consenting by reason of being mentally incapacitated and physically helpless, or, in the alternative, one count of rape in the third degree.

Springstun had objected, arguing that the late amendment prejudiced his defense because he had already cross-examined A.B. based on a theory of forcible compulsion and would have done so differently on an allegation of incapable of consent. While the trial court rejected Springstun's claim that the amendment would have changed his cross-examination strategy, it ordered that A.B. return the next day for Springstun to conduct further cross-examination as a means to address any potential prejudice.

The jury found Springstun guilty of rape in the second degree on the basis that A.B. was incapable of consent. The trial court imposed an indeterminate sentence of 84 months to life in prison, followed by community custody upon release.

Springstun timely appealed.

ANALYSIS

I.      Midtrial Amendment

Springstun avers that the second amendment of the information, which occurred after A.B.'s cross-examination, violated CrR 2.1 and his rights under article I, section 22 of the Washington Constitution. Specifically, he contends the late amendment "shifted the ground under [his] feet, disabling his defense." The State responds that the late amendment of the information did not prejudice Springstun because it did not add charges, require new facts, or affect his trial

- 6 -

strategy. It also emphasizes that the trial court "ameliorated any potential prejudice" by allowing further cross-examination of A.B. The State is correct.

Under CrR 2.1(d), the court may permit an amendment to the information "at any time before verdict or finding if substantial rights of the defendant are not prejudiced." But, this rule is limited by our constitution. *State v. Gehrke*, 193 Wn.2d 1, 7, 434 P.3d 522 (2019). Pursuant to article I, section 22, the "accused must be informed of the charge [they are] to meet at trial and cannot be tried for an offense not charged." *State v. Carr,* 97 Wn.2d 436, 439, 645 P.2d 1098 (1982). These constitutional rights inherently limit when and whether the State may make midtrial amendments to its information. *Gehrke*, 193 Wn.2d at 7. Thus, "'defendants have a right to be fully informed of the nature of accusations against them so that they may prepare an adequate defense.'" *Id*. at 6-7 (quoting *State v. Leach,* 113 Wn.2d 679, 695, 782 P.2d 552 (1989)).

Deciding whether an amendment should be granted is left to the discretion of the trial court, and the court's decision is reviewed only for abuse of that discretion. *State v. Brooks*, 195 Wn.2d 91, 96, 455 P.3d 1151 (2020). A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons. *Id*. at 97.

Here, the State moved to amend the information after A.B. testified, but before formally resting its case. Springstun objected, arguing that while that count had reverted to its original allegation, he was nonetheless without notice during jury selection, opening statements, and most critically, A.B.'s cross-examination. He maintained that the amendment introduced a distinct legal theory with separate

elements and, had he known about it, he would have cross-examined A.B. differently. Specifically, he would have challenged the credibility of her claim that she was asleep, rather than focusing on the absence of any evidence of forcible compulsion.

The trial court analyzed Springstun's opening statement and A.B.'s cross-examination before discussing the relevant case law, including *State v. Hampton*,[2] which involved a similar factual scenario. It then asked how Springstun would have cross-examined A.B. differently, given that the State had already charged him with an inferior degree offense, rape in the third degree, as an alternative. Springstun responded,

> We have to know, we have to have notice so we can craft our defense and our cross-examination. And so there are other areas of impeachment and in terms of flipping the question of which statement are we accrediting. If she's now saying that she was asleep, then we would accredit the defense interview much more weight and go into more contradictions and why the jury then perhaps should believe the defense version versus her testimony here.

The trial court ultimately permitted the amendment, reasoning that Springstun had not demonstrated prejudice. However, it gave him another opportunity to cross-examine A.B., and noted the following:

> The defense in this case as articulated to the jury was one of clear acquittal as to both charges. It wasn't tipping the balance that maybe the rape 3 happened and the rape 2 did not happen. The opening that was given to the jury was a clear not guilty on both counts. This court heard questioning of [A.B.] by the State and the defense, and the defense clearly zeroed in on when she woke up and what was happening when she woke up, which would both be a defense to the amended charge of incapable to consent as well as rape in the third degree.

---

[2] Although the verbatim report of proceedings indicates the judge referred to "the *Hamilton* case" during trial, the intended reference was to *State v. Hampton*, 182 Wn. App. 805, 332 P.3d 1020 (2014), *rev'd*, 184 Wn.2d 656, 361 P.3d 734 (2015).

The State, after having read the *Hamilton* [sic] case, is going to be asking for a lesser-included offense of rape in the third degree. We'll see if the defense joins in that request or not. And the defense—well, the State still has the opportunity to call [A.B.] in its case in chief. Even if it does not elect to do so, the defense has a right to call, as they cross-endorsed all witnesses at the beginning of this trial, [A.B.] back to the stand to question her more fully as—I'm not sure how more fully you can question her since you already questioned her on this topic about when she woke up and what was happening.

(Emphasis added.)

On appeal, Springstun invokes *State v. Pelkey*, 109 Wn.2d 484, 487, 745 P.2d 854 (1987) and contends that his "likely successful defense was not just hobbled, but disabled by the timing of the amendment, the nature and degree of the prejudice caused is akin to that suffered where an improper amendment is permitted after the State has rested."

"A criminal charge may not be amended after the State has rested its case in chief unless the amendment is to a lesser degree of the same charge or a lesser included offense." *Pelkey*, 109 Wn.2d at 491. "[U]nder 'the *Pelkey* rule' any amendment from one crime to a different crime after the State has rested is per se prejudicial." *State v. Martinez Platero*, 17 Wn. App. 2d 716, 721, 487 P.3d 910 (2021) (quoting *State v. Vangerpen*, 125 Wn.2d 782, 791, 888 P.2d 1177 (1995)). *Pelkey* does not apply here because the State had not yet rested and its rule applies only "when the State explicitly states that it will rest its case after moving to amend, . . . [because] it has *functionally rested its case in chief.*" *Gehrke*, 193 Wn.2d at 11.

Springstun alternatively avers reversal is still required because the amendment prejudiced his ability to craft a defense as it altered the elements the

State had to prove. He asserts that, had he known about the amended charge earlier, he would "have been able to seek acquittal in closing argument, or to argue that the incident, *if the jury thought it occurred at all*, was only non-consensual third degree rape."[3] (Emphasis added.) This argument, however, is speculative and does not establish prejudice. His trial strategy, categorically denying that any sexual contact occurred, remained unchanged even after the trial court allowed the amendment and additional cross-examination. Toward that end, he focused on undermining A.B.'s credibility and highlighting inconsistencies in her statements.

In determining prejudice under CrR 2.1(d), this court considers factors such as whether a defendant's ability to defend themselves was jeopardized and whether the amended charge arose out of the same factual scenario. *State v. Hakimi*, 124 Wn. App. 15, 28, 98 P.3d 809 (2004). Midtrial amendments of a charging instrument have been allowed where the amendment merely specified a different manner of committing the crime originally charged. *See, e.g., Gehrke*, 193 Wn.2d at 19 n.8; *State v. Schaffer*, 120 Wn.2d 616, 621, 845 P.2d 281 (1993); *Pelkey*, 109 Wn.2d at 490-91; *State v. Gosser*, 33 Wn. App. 428, 435, 656 P.2d 514 (1982).

It is clear from this record that Springstun cannot show that any of his substantial rights were prejudiced. He fails to demonstrate how the amendment impaired his ability to defend himself, particularly given his denial defense. The

---

[3] While Springstun argues that his own theory of the case precluded him from challenging rape in the second degree, premised on A.B. being incapable of consent, he does not explain why he failed to argue non-consensual rape in the third degree.

amendment did not introduce new charges or facts, nor did it mislead or surprise Springstun as count one merely reverted back to the original charge, which had been pending for over two years prior to the initial amendment just before the start of trial. Our constitution only guarantees notice of the charges one faces, but does not impose an outright ban on midtrial amendments. *See* WASH. CONST., art. I, § 22.

Because Springstun has not shown that his substantial rights were prejudiced by the State's amendment prior to resting its case in chief, we hold that the trial court did not abuse its discretion in allowing the amendment.

II.   Evidentiary Rulings

Springstun argues the trial court abused its discretion when it admitted A.B.'s disclosure to Martinez and Klasing under the effect on the listener doctrine. He also contends that A.B.'s report to her mother and aunt was inadmissible under the fact of complaint doctrine because it was untimely.

We review a trial court's decision to admit evidence for abuse of discretion. *State v. Martinez*, 196 Wn.2d 605, 614, 476 P.3d 189 (2020). An abuse of discretion occurs if the trial court's decision is manifestly unreasonable, unsupported by the record, or based on an incorrect legal standard. *State v. Burns,* 193 Wn.2d 190, 202, 438 P.3d 1183 (2019).

Here, the trial court carefully analyzed relevant hearsay rules, fact of complaint caselaw, and the circumstances surrounding A.B.'s disclosure to her mother and Klasing. It granted the State's motion and noted the following:

First, I'm admitting it under ER 801(c) as not hearsay and not offered for the truth of the matter asserted, but I'm admitting it as the effect on the listener and explanation for the mother's next step after listening to the complaint of the rape, of why the mother went to the defendant's home to speak to him about the complaint after having not seen him in just over a year after he moved out of the home.

This conversation I find to be a central issue in the case as to the events that transpired the night of the family gathering and the mother and aunt's subsequent conversation that night with the defendant.

. . . .

I will be giving a limiting instruction regarding the evidence. Additionally, since I'm admitting it as two forms of evidence, as complaint evidence and under 801(c), I'm going to take the more restrictive path for the complaint evidence about what is actually admissible. So, for instance, under 801(c), the fact of the defendant's identification or even some details may be admissible under 801(c). But under the complaint rule, only the fact that she stated she was raped comes in. It doesn't go to the details of the allegation. It doesn't go to the identity of the defendant. And so I'm going to take the more restrictive rule and apply that application as admissible evidence in this case.

Again, under either rule, it's not admitted for the truth of the matter asserted as substantive evidence. So the more restrictive method will be applied here, and I will give a limiting instruction as to why this evidence is being admitted.

And I will defer to the defense to draft the limiting instruction or at least take a first crack at it. And I will defer to the defense as to when you want that read. So if you want it read while the testimony is taking place, if you want it read earlier than that, or if you want it as just part of the jury instruction packet, or whether you want it read twice when the testimony is given and in the jury instruction packet. I defer to you on how you are urging the court to give a limiting instruction. If you don't want a limiting instruction, and I think that one does need to be given, but I will hear argument if you really do not one [sic] given to draw attention to it. So I defer to you on that. And you don't need to respond now. I'll give you the day to digest that and we can handle it maybe at the end of the day or on Monday. But let's readdress it before opening statement so I know exactly what your thoughts are on that.

Springstun avers that the effect on the listener rationale was improper. He relies on *State v. Rocha*, where Division Three of this court held that an out-of-court statement was irrelevant for the nonhearsay purpose for which it was

admitted. 21 Wn. App. 2d 26, 31-32, 504 P.3d 233 (2022). However, *Rocha* is distinguishable. There, the hearsay statement had no relevance, apart from establishing that father and son had argued, to prove the son had a motive to set a car on fire on his father's property. *Id*.

Here, A.B.'s disclosure explained Martinez and Klasing's actions in confronting Springstun after he moved out a year prior. It was not offered to prove the truth of the matter asserted. *See* ER 801(c). "An out of court statement offered to prove the mental or emotional effect upon the hearer or reader is not objectionable as hearsay." 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.15, at 52 (6th ed. 2016). Hearsay statements not offered for their truth but for another relevant purpose may be admitted. *State v. Aaron*, 57 Wn. App. 277, 280, 787 P.2d 949 (1990). Hearsay statements not offered for their truth are inadmissible only if the purpose for which they are offered is irrelevant. *Rocha*, 21 Wn. App. 2d at 31-32.

The State contends that this confrontation was highly relevant because it explained how Martinez and Klasing came to confront Springstun, which provided context for their interpretation of Springstun's response and demeanor as a tacit admission that he had raped A.B. We agree with the State as to relevance.[4]

---

[4] The State separately avers that although Springstun objected to the evidence on hearsay grounds at trial, he did not raise this specific objection that he now asserts on appeal: that the effect on the listener basis for admission is no longer valid. A party may assign error in the appellate court only on the specific ground of the evidentiary objection made at trial. *State v. Scherf*, 192 Wn.2d 350, 386, 429 P.3d 776 (2018).

While Springstun likely failed to preserve this particular issue for appeal, the State nonetheless provided a substantive response in briefing such that we exercise our discretion to analyze this assignment of error given its relationship to Springstun's other challenge to this same evidence.

Springstun also fails to demonstrate prejudice. The trial court provided a limiting instruction during A.B.'s and Martinez' testimony that stated the following:

> [Y]ou may consider this testimony only for a limited purpose: that (1) she made the complaint, (2) the effect of hearing that assertion had on Ms. Martinez and Ms. Klasing. It is not admitted for the truth of the statement. You may not consider this evidence for any other purpose.

At the close of the evidence, the court repeated this limiting instruction, referencing the testimony of A.B., Martinez, and Klasing.[5] We presume the jury follows the court's instruction. *State v. Rivers*, 1 Wn.3d 834, 869-70, 533 P.3d 410 (2023). This evidence was relevant to provide context for the interaction that the State presented as an effective admission by Springstun. Contrary to Springstun's assertion in his opening brief, this is a valid basis for admission.

The trial court did not abuse its discretion given the significant discretion it has to consider the circumstances and admit evidence under the effect on the listener doctrine. Because it was separately admissible under this doctrine, we need not reach the merits of Springstun's challenge to its admission pursuant to the fact of complaint doctrine.

III.    Cumulative Error

Finally, Springstun argues that the cumulative error doctrine applies, asserting that even if no single error requires reversal, the totality of alleged errors denied him a fair trial. The record does not support his claim.

---

[5] The State points out in its brief, in the context of its harmless error analysis, that the challenged testimony consisted of a simple "yes" from both Martinez and Klasing. Because we conclude that A.B.'s disclosure was properly admitted and did not prejudice Springstun's substantial rights, we need not consider the State's argument on harmless error.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery,* 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Even if any individual error standing alone would otherwise be harmless, the doctrine may warrant reversal when the errors are taken together. *State v. Weber,* 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." *Id.*

Springstun fails to demonstrate any individual or cumulative error warranting reversal. Accordingly, the cumulative error doctrine does not apply here.

Affirmed.

WE CONCUR: